## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

HSBC MORTGAGE SERVICES INC.
formerly known as HOUSEHOLD
FINANCIAL SERVICES, INC., a Delaware
corporation,

           Plaintiff,

v.

AMERICAN FREEDOM MORTGAGE,
INC., a Georgia corporation,

           Defendant.

)
)
)
)
)
)
)
)
)
)
)

**07CV0723**

**JUDGE COAR**

**MAG. JUDGE MASON**

No.

**FILED**

FEB 0 6 2007

Feb. 6, 2007

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

### COMPLAINT

Plaintiff HSBC Mortgage Services Inc. formerly known as Household Financial Services, Inc. ("HSBC") by its attorneys and for its complaint against defendant American Freedom Mortgage, Inc. ("American Freedom"), states as follows:

### Nature of the Action

1.    HSBC brings this action to enforce American Freedom's obligation to indemnify HSBC for damages arising out of HSBC's purchase of certain residential mortgage loans from American Freedom in accordance with the terms of two contracts between the parties (the "Loan Purchase Agreement" and the "Flow Loan Purchase Agreement," as further defined below).

2.    Pursuant to the terms of the Loan Purchase Agreement and the Flow Loan Purchase Agreement, American Freedom agreed to sell and HSBC agreed to purchase certain residential mortgage loans from American Freedom.

3.    For each such loan, American Freedom provided specific and clear representations and warranties to HSBC. If any loan HSBC purchased pursuant to the Loan Purchase Agreement did not conform with such representations and warranties, the Loan

Purchase Agreement required American Freedom to repurchase that loan from HSBC at a price calculated pursuant to a clear and definite formula set forth in the Loan Purchase Agreement.

4.    In addition, pursuant to Section 7b of the Flow Loan Purchase Agreement, American Freedom is obligated to refund to HSBC certain premiums if borrowers prepaid their loans in full.

5.    The Loan Purchase Agreement and Flow Loan Purchase Agreement also obligated American Freedom to indemnify HSBC for any loss, including all costs, expenses and attorneys' fees, HSBC might incur in relation to any loan as a result of American Freedom's breach of its representations and warranties or failure to perform any of its covenants or agreements in relation to such loan.

6.    HSBC brings this action because American Freedom sold several loans to HSBC that did not conform to American Freedom's representations and warranties in the Loan Purchase Agreement, but failed and refused to repurchase those loans from HSBC when requested to do so, and because American Freedom also has failed and refused to indemnify HSBC for losses HSBC sustained as the result of American Freedom's breaches of its representations and warranties and failure to perform its covenants and agreements as to those loans.

7.    HSBC also brings this action because American Freedom has failed and refused to refund to HSBC certain premiums for prepaid loans pursuant to the Flow Loan Purchase Agreement, and because American Freedom also has failed and refused to indemnify HSBC for losses HSBC sustained as the result of American Freedom's breaches of its representations and warranties and failure to perform its covenants and agreements as to those loans.

8.    HSBC therefore seeks to recover all damages, costs, expenses and fees, including attorneys' fees, it has incurred as a result of American Freedom's breach of its representations and warranties and failure to perform its covenants and agreements under the Loan Purchase Agreement and the Flow Loan Purchase Agreement.

### General Allegations

**A.    The Parties.**

9.    Plaintiff HSBC Mortgage Services Inc. formerly known as Household Financial Services, Inc. is a Delaware corporation with its principal place of business in Prospect Heights, Illinois.  HSBC is in the business of, among other things, acquiring and servicing mortgage loans and loan portfolios originated by other mortgage lenders or mortgage brokers.

10.    Defendant American Freedom Mortgage, Inc. is a Georgia corporation with its principal place of business in Marietta, Georgia.  Upon information and belief, American Freedom is in the business of making, originating or otherwise acquiring residential mortgage loans, and selling or re-selling such loans to purchasers, such as Household, in the secondary market.

**B.    Jurisdiction and Venue.**

11.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  This civil action is between citizens of different states and the sum in controversy exceeds $75,000, exclusive of interest and costs.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) and (b)(2) in that a substantial part of the events giving rise to the claim occurred in this judicial district and also pursuant to the express agreement of the parties as set forth in Section 12.14 of the Loan Purchase Agreement and Section 28 of the Flow Loan Purchase Agreement.

C.    **The Loan Purchase Agreement.**

13.    HSBC and American Freedom entered into the Loan Purchase Agreement at issue on or about March 29, 2002. (A true and correct copy of the Loan Purchase Agreement is attached hereto as Exhibit A.)

14.    As stated above, in the Loan Purchase Agreement, American Freedom agreed to sell, from time to time, certain residential mortgage loans to HSBC and HSBC agreed to purchase, from time to time, certain residential mortgage loans from American Freedom.

15.    For each loan HSBC agreed to purchase, American Freedom agreed to deliver to HSBC certain key documents for each loan, such as: (a) all original agreements with the obligor under the loan (the "Borrower"), including the original note and mortgage; and (b) other related documents, including a title report for the mortgaged property, a credit report for the Borrower, a residential appraisal report for the mortgaged property and other documents identified in Section 1.1 of the Loan Purchase Agreement (the "Loan Documents").

16.    Because HSBC agreed to purchase loans originated by American Freedom (or by another mortgage banker who sold those loans), and because HSBC was not involved in the origination of any of the loans it purchased from American Freedom, the Loan Purchase Agreement required American Freedom to make certain clear representations and warranties to HSBC relating to each loan.

17.    HSBC's decision to purchase any specific loan from American Freedom was based, in part, on HSBC's reliance upon the genuineness and accuracy of the Loan Documents, and the truthfulness of American Freedom's representations and warranties, pertaining to such loan.

18.    Under the terms of the Loan Purchase Agreement and pursuant to American Freedom's signing of the Loan Purchase Agreement, American Freedom expressly recognized HSBC's reliance upon American Freedom's representations and warranties.

19.    In Section 4.2(b) of the Loan Purchase Agreement, American Freedom represented and warranted with respect to each loan it would sell to HSBC that, among other things, the "documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact and do not omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading."

20.    In Section 4.2(c) of the Loan Purchase Agreement, American Pioneer represented and warranted with respect to each loan it would sell to HSBC that, among other things, "[t]he Note and the Mortgage are genuine, and each is the legal, valid and binding obligation of the Obligor thereunder. . . .  All parties to the Note and the Mortgage and any other related agreement had legal capacity to enter into the Loan and to execute and deliver the Note and the Mortgage and any other related agreement, and the Note and the Mortgage and any other related agreements have been duly and properly executed by such parties."

21.    In Section 4.3(c) of the Loan Purchase Agreement, American Freedom represented and warranted with respect to each loan that it would sell to HSBC that: "[N]o Loan is 30 or more days delinquent (determined on a contractual basis) and no Loan will have been 30 or more days delinquent (determined on a contractual basis) more than once during the 12 months preceding the Settlement Date. The borrower has made, or shall make when due, as the case may be, the first monthly payment due after the origination on or prior to its Due Date."

22.    In Section 4.3(1) of the Loan Purchase Agreement, American Freedom represented and warranted with respect to each loan it would sell to HSBC that:

> The Note and the Mortgage and every other agreement, if any, executed and delivered by the Obligor in connection with the Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms. All parties to the Note, the Mortgage and each other such related agreement had legal capacity to enter into the Loan and to execute and deliver the Note, the Mortgage and each other such related agreement, and the Note, the Mortgage and each other such related agreement have been duly and properly executed by the respective Obligors. Seller has reviewed all of the documents constituting the Mortgage File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein.

23.    Section 9.1 of the Loan Purchase Agreement provides that, upon notice, HSBC may require American Freedom to repurchase any loan it sold to HSBC if the loan does not conform with American Freedom's warranties, representations or agreements contained in the Loan Purchase Agreement, or if American Freedom otherwise acts fraudulently or negligently in the origination or closing of any such loan.

24.    Section 9.2 of the Loan Purchase Agreement sets forth a clear formula for calculating the price for any loan to be repurchased by American Freedom pursuant to Section 9.1 of the Loan Purchase Agreement.

25.    Section 10.1 of the Loan Purchase Agreement further obligates American Freedom to indemnify HSBC for "any loss, cost, expense, damage, liability, or claim (including, without limitation, all Legal Fees) relating to, arising out of, based upon, or resulting from... [American Freedom's] breach of any of [its] representations and warranties" or "[American Freedom's] breach of, or failure to perform, any of [its] covenants or agreements" set forth in the Loan Purchase Agreement.

26.    Pursuant to Section 12.11 of the Loan Purchase Agreement, HSBC and American Freedom agreed that the Loan Purchase Agreement "shall be governed by and construed in accordance with the laws of the State of Illinois."

**D.    The Flow Loan Purchase Agreement.**

27.    On March 29, 2002, HSBC and American Freedom also entered into a Flow Loan Purchase Agreement.  (A true and correct copy of the Flow Loan Purchase Agreement is attached hereto as Exhibit B.)

28.    As stated above, in the Flow Loan Purchase Agreement, American Freedom agreed to sell, from time to time, certain residential mortgage loans to HSBC and HSBC agreed to purchase, from time to time, certain residential mortgage loans from American Freedom.

29.    In Section 7b of the Flow Loan Purchase Agreement, American Freedom agreed that "In the event that a premium is paid by [HSBC] to [American Freedom] on a Loan and such Loan is prepaid in full by the Borrower, other than by a refinancing by [HSBC] or any of its subsidiaries or affiliates, within twelve (12) months of the purchase date, [American Freedom] shall, upon demand by [HSBC], refund to [HSBC] the premium paid by [HSBC] to [American Freedom]." Section 7b sets forth a clear formula for the calculation of the premium rebate to be refunded by American Freedom to HSBC in the event a Loan is prepaid by the Borrower.

30.    Section 12 of the Flow Loan Purchase Agreement further obligates American Freedom to indemnify and hold HSBC harmless for "any loss, damages, penalties, fines, forfeitures, legal fees, and related costs, judgments, and other costs and expenses heretofore and hereafter resulting from any claim, demand, defense or assertion based or grounded upon, resulting from or arising in connection with, a breach of [American Freedom's] covenants, representations and warranties under this Agreement, the HFS Seller Guide or any Letters."




31.    Pursuant to Section 26 of the Flow Loan Purchase Agreement, HSBC and American Freedom agreed that the Flow Loan Purchase Agreement "shall be governed by and be considered in accordance with the laws of the State of Illinois."

**E.    HSBC's Purchase of the Loans Under the Loan Purchase Agreement.**

32.    Under and pursuant to the terms of the Loan Purchase Agreement, HSBC purchased the following loans (collectively, the "Loans") from American Freedom on or about the dates indicated:

| Loan | Date of Purchase |
|---|---|
| Loan # 11265204 (the "Cotton Loan") | 9/15/05 |
| Loan # 10354959 (the "Harris Loan") | 5/13/05 |

HSBC subsequently determined that each of the Loans failed to comport with American Freedom representations and warranties or with a condition of the Loan Purchase Agreement.

**1.    The Cotton Loan.**

33.    The borrower failed to make the first monthly payment with respect to the Cotton Loan on its due date.

34.    Such failure to make the first monthly payment constitutes a breach by American Freedom of its representations and warranties set forth in the Loan Purchase Agreement, including but not limited to those set forth in Section 4.3(c).

35.    On the basis of the foregoing, and pursuant to Section 9.1 of the Loan Purchase Agreement, HSBC requested American Freedom to repurchase the Cotton Loan on December 28, 2005. (A true and correct copy of HSBC's repurchase demand letter relating to the Cotton Loan is attached hereto as Exhibit C.)

36.    In accordance with the formula set forth in Section 9.2 of the Loan Purchase Agreement, the repurchase price for the Cotton Loan was $102,661.73 as of January 13, 2006, with per diem interest of $27.39 accruing thereafter.

37.    American Freedom failed and refused to repurchase the Cotton Loan from HSBC in breach of its obligations under Section 9.1 of the Loan Purchase Agreement.

38.    As a result of American Freedom's failure and refusal to perform its repurchase covenants and agreements in relation to the Cotton Loan, HSBC has incurred damages in relation to the Cotton Loan, exclusive of pre- and post-judgment interest.  HSBC has also been required to retain counsel and has incurred and will continue to incur costs, expenses and attorneys' fees in relation to this action.

**2.    The Harris Loan.**

39.    The borrower failed to make the first monthly payment with respect to the Harris Loan on its due date.

40.    Such failure to make the first monthly payment constitutes a breach by American Freedom of its representations and warranties set forth in the Loan Purchase Agreement, including but not limited to those set forth in Section 4.3(c).

41.    On the basis of the foregoing, and pursuant to Section 9.1 of the Loan Purchase Agreement, HSBC requested American Freedom to repurchase the Harris Loan on September 22, 2005.  (A true and correct copy of HSBC's repurchase demand letter relating to the Harris Loan is attached hereto as Exhibit D.)

42.    In accordance with the formula set forth in Section 9.2 of the Loan Purchase Agreement, the repurchase price for the Harris Loan was $153,006.05 as of October 15, 2005 with per diem interest of $39.42 accruing thereafter.

43.    American Freedom failed and refused to repurchase the Harris Loan from HSBC in breach of its obligations under Section 9.1 of the Loan Purchase Agreement.

44.    As a result of American Freedom's failure and refusal to perform its repurchase covenants and agreements in relation to the Harris Loan, HSBC has incurred damages in relation to the Harris Loan, exclusive of pre- and post-judgment interest. HSBC has also been required to retain counsel and has incurred and will continue to incur costs, expenses and attorneys' fees in relation to this action.

**F.    HSBC's Purchase of the Loans Under the Flow Loan Purchase Agreement.**

45.    Under and pursuant to the terms of the Flow Loan Purchase Agreement, HSBC purchased the following Loans from American Freedom on or about the dates indicated:

| Loan | Date of Purchase |
|------|------------------|
| **Loan # 10375699 (the "Gaines Loan")** | 5/19/05 |
| **Loan # 09632639 (the "Merrell Loan")** | 1/10/05 |
| **Loan # 09259516 (the "Ashley Loan")** | 11/10/04 |
| **Loan # 11074747 (the "Gorman Loan")** | 8/25/05 |

46.    From the time HSBC and American Freedom entered the Flow Loan Purchase Agreement on March 29, 2002, four (4) American Freedom borrowers have pre-paid their loans in full (the "Prepayment Loans").

47.    American Freedom owes HSBC a premium rebate refund on the Prepayment Loans.

48.    On the basis of the foregoing, and pursuant to Section 7b of the Flow Loan Purchase Agreement, HSBC requested American Freedom to refund HSBC the premium rebate due for loans that were paid off in full. HSBC sent letters to American Freedom seeking the

premium rebate refund on July 12, 2005, September 19, 2005, and October 11, 2005. (True and correct copies of HSBC's premium rebate refund demand letters relating to the Prepayment Loans are attached hereto as Exhibit E.)

49.   In accordance with the formula set forth in Section 7b of the Flow Loan Purchase Agreement, HSBC is entitled to a premium rebate refund in the total amount of $12,868.96 for loans paid as-of September, 2005, as well as any previously unpaid bills.

50.   American Freedom failed and refused to refund the premium rebates to HSBC for the Prepayment Loans in breach of its obligations under Section 7b of the Flow Loan Purchase Agreement.

51.   As a result of American Freedom's failure and refusal to perform its premium rebate covenants and agreements in relation to the Prepayment Loans, HSBC has incurred damages in relation to the Prepayment Loans, exclusive of pre- and post-judgment interest. HSBC has also been required to retain counsel and has incurred and will continue to incur costs, expenses and attorneys' fees in relation to this action.

## COUNT I - BREACH OF CONTRACT

52.   HSBC realleges and incorporates herein by this reference each of the allegations contained in paragraphs 1-51 above as though fully set forth herein.

53.   The Loan Purchase Agreement and Flow Loan Purchase Agreement are valid, binding and enforceable contracts between American Freedom and HSBC.

54.   HSBC has performed its obligations under the Loan Purchase Agreement and the Flow Loan Purchase Agreement.

55.   The borrowers' failures to make the first monthly payments for the Cotton and Harris Loans constitute a breach of American Freedom's representations and warranties to HSBC under the Loan Purchase Agreement.

56.   Despite HSBC's proper demand, American Freedom failed and refused to repurchase the Cotton and Harris Loans in breach of its covenants and agreements under the Loan Purchase Agreement.

57.   As a result of American Freedom's breach of its representations and warranties and failure to perform its covenants and agreements under the Loan Purchase Agreement in relation to the Cotton and Harris Loans, HSBC has incurred and continues to incur damages, costs, expenses and fees, including attorneys' fees, in relation to the Cotton and Harris Loans.

58.   In accordance with Section 10.1 of the Loan Purchase Agreement, American Freedom is obligated to indemnify HSBC for all such damages, costs, expenses and attorneys' fees.

59.   In breach of its obligations under the Loan Purchase Agreement, American Freedom has failed and refused to indemnify HSBC for such damages, costs, expenses, and fees in relation to the Cotton and Harris Loans.

60.   Additionally, in accordance with Section 7b of the Flow Loan Purchase Agreement, American Freedom is obligated to refund to HSBC the premium rebates for the four (4) Prepayment Loans that were paid off through September, 2005.

61.   Despite HSBC's proper demand, American Freedom failed and refused to refund the premium rebates in breach of its covenants and agreements under the Flow Loan Purchase Agreement.

62.   As a result of American Freedom's breach of its representations and warranties and failure to perform its covenants and agreements under the Flow Loan Purchase Agreement in relation to the Prepayment Loans, HSBC has incurred and continues to incur damages, costs, expenses and fees, including attorneys' fees, in relation to the Prepayment Loans.

63.    In accordance with Section 12 of the Loan Purchase Agreement, American Freedom is obligated to indemnify HSBC for all such damages, costs, expenses and attorneys' fees.

64.    In breach of its obligations under the Flow Loan Purchase Agreement, American Freedom has failed and refused to indemnify HSBC for such damages, costs, expenses, and fees in relation to the Prepayment Loans.

WHEREFORE, plaintiff HSBC Mortgage Services Inc. formerly known as Household Financial Services, Inc. respectfully requests that the Court enter a judgment in its favor and against defendant American Freedom Mortgage, Inc., as follows:

A.    Awarding plaintiff all damages (including the repurchase price for all of the loan which exceeds $269,500.00, costs, expenses and fees (including attorneys' fees) it has incurred in relation to the Cotton Loan, the Harris Loan and the Prepayment Loans, as well as the preparation, filing and prosecution of this lawsuit, in an amount to be proven at trial, plus all applicable pre- and post-judgment interest; and

B.    For such other and further relief as the Court deems just and equitable.


HSBC MORTGAGE SERVICES INC.
formerly known as HOUSEHOLD
FINANCIAL SERVICES, INC.

_____
One of the attorneys for Plaintiff


Neal H. Levin (ARDC # 6203156)
Suzanne M. Scheuing (ARDC #6270563)
Freeborn & Peters LLP
311 S. Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000

1189826.2

### *EXHIBIT LIST*

EXHIBIT A:  Bulk Continuing Loan Purchase Agreement By and Between Household Financial Services, Inc. American Freedom Mortgage, Inc. Dated as of March 29, 2002

EXHIBIT B:  Flow Loan Purchase Agreement By and Between Household Financial Services, Inc. and American Freedom Mortgage, Inc. Dated as of March 29, 2002

EXHIBIT C:  Correspondence to American Freedom Mortgage, Inc.

EXHIBIT D:  Correspondence to American Freedom Mortgage, Inc.

EXHIBIT E:  Correspondence to American Freedom Mortgage, Inc.

# EXHIBIT A

# BULK CONTINUING LOAN PURCHASE AGREEMENT

# BY AND BETWEEN

# HOUSEHOLD FINANCIAL SERVICES, INC.

# AMERICAN FREEDOM MORTGAGE, INC

DATED AS OF __3|29__ , 2002

# TABLE OF CONTENTS

Page No.

SECTION 1 DEFINITIONS
Section 1.1 Defined Terms ...................................................................................................1
Section 1.2 Other Terms ......................................................................................................6

SECTION 2  PURCHASE OF LOANS AND TRANSFER OF SERVICING
Section 2.1 Offer to Sell .....................................................................................................6
Section 2.2 Buyer's Response and Seller's Acceptance......................................................7
Section 2.3 Purchase of Loans and Servicing Rights .........................................................7
Section 2.4 Purchase Price...................................................................................................7
Section 2.5 Premium Rebate................................................................................................7
Section 2.6 Transfer of Servicing .......................................................................................8

SECTION 3  SETTLEMENT
Section 3.1 Place and Time of Settlement ..........................................................................8
Section 3.2 Seller's Deliveries at Settlement......................................................................8
Section 3.3 Buyer's Deliveries at Settlement .....................................................................9

SECTION 4  REPRESENTATIONS AND WARRANTIES
Section 4.1 General Representations and Warranties of Seller ...........................................9
Section 4.2 Representations and Warranties of Seller Regarding the Offered Loans .............11
Section 4.3 Representations and Warranties of Seller Regarding the Loans...........................12
Section 4.4 General Representations and Warranties of Buyer..........................................21

SECTION 5  PRE-SETTLEMENT COVENANTS
Section 5.1 Continued Servicing ......................................................................................22
Section 5.2 Preparation of Assignments...........................................................................22
Section 5.3 IRS Reporting ................................................................................................23
Section 5.4 Compliance with Law ....................................................................................23
Section 5.5 No Sale of Assets ...........................................................................................23
Section 5.6 Private Mortgage Insurance ...........................................................................23

SECTION 6  POST-SETTLEMENT COVENANTS
Section 6.1 Notice of Servicing Transfer..........................................................................23
Section 6.2 IRS Examination.............................................................................................24
Section 6.3 Tax on Sale ....................................................................................................24
Section 6.4 Books and Records .........................................................................................24
Section 6.5 On Site Audits................................................................................................24
Section 6.6 Financial Statements ......................................................................................24
Section 6.7 Post-Sale Loan Payments ..............................................................................25
Section 6.8 Transfer of Servicing Rights..........................................................................25
Section 6.9 Delivery of Mortgage Loan Documents .........................................................25

SECTION 7  CONDITIONS TO SETTLEMENT
    Section 7.1 Conditions to Buyer's Obligations ...................................................................25
    Section 7.2 Opinion of Counsel..........................................................................................27
    Section 7.3 Conditions to Seller's Obligations....................................................................27

SECTION 8  SURVIVAL OF COVENANTS, REPRESENTATIONS AND WARRANTIES;
             REPURCHASE OBLIGATION OF SELLER ...............................................................28

SECTION 9  POST-SETTLEMENT AND ADJUSTMENTS
    Section 9.1 Repurchase Obligations ....................................................................................28
    Section 9.2 Repurchase Price...............................................................................................29
    Section 9.3 Remedy to Insure Accuracy of Real Estate Appraisals ....................................29
    Section 9.4 Post-Settlement Adjustment to Purchase Price..................................................30

SECTION 10  INDEMNIFICATION
    Section 10.1 Seller's Indemnification...................................................................................30
    Section 10.2 Buyer's Indemnification ..................................................................................31
    Section 10.3 Indemnification Procedures .............................................................................31

SECTION 11  TERMINATION
    Section 11.1 Termination by Either Party .............................................................................33
    Section 11.2 Termination by Buyer.......................................................................................33
    Section 11.3 Effect of Termination........................................................................................34

SECTION 12  MISCELLANEOUS
    Section 12.1 No Waiver.........................................................................................................34
    Section 12.2 Amendment and Modification ..........................................................................34
    Section 12.3 Notices .............................................................................................................34
    Section 12.4 Expenses ..........................................................................................................36
    Section 12.5 No Remedy Exclusive ......................................................................................36
    Section 12.6 Independent Contractor.....................................................................................36
    Section 12.7 Severability.......................................................................................................36
    Section 12.8 Entire Agreement..............................................................................................36
    Section 12.9 Assignment .......................................................................................................36
    Section 12.10 Captions..........................................................................................................37
    Section 12.11 Governing Law ...............................................................................................37
    Section 12.12 Counterparts....................................................................................................37
    Section 12.13 Drafting...........................................................................................................37
    Section 12.14 Choice of Forum .............................................................................................37
    Section 12.15 WAIVER OF  JURY TRIAL ...........................................................................37

EXHIBITS

Exhibit A - Contents of Legal File ..................................................................... E-1
Exhibit B - Contents of Credit File...................................................................... E-3
Exhibit C – Limited Power of Attorney .............................................................. E-6

SCHEDULES

Schedule 1 - Information to be Included in Offered Loan Schedule ..................................... S-1
Schedule 2 - Seller's Underwriting Standards for Mortgage Loans ..................................... S-3

## BULK CONTINUING LOAN PURCHASE AGREEMENT

THIS BULK CONTINUING LOAN PURCHASE AGREEMENT is made and entered into this *29* day of *March*, 2002 by and between HOUSEHOLD FINANCIAL SERVICES, INC., a Delaware corporation ("HFS", with its Affiliates, "Buyer"), and AMERICAN FREEDOM MORTGAGE, a GEORGIA corporation ("Seller").

WHEREAS, Seller is engaged in the business of originating, acquiring and servicing fixed and adjustable rate mortgage loans, and has proposed to offer to sell portfolios of such loans to Buyer from time to time subject to Buyer's review and acceptance of all or any part of each such portfolio; and

WHEREAS, Seller desires from time to time to sell to Buyer, and Buyer desires from time to time to purchase from Seller certain loans due and to become due thereunder.

NOW THEREFORE, in consideration of the promises and other covenants contained herein, Buyer and Seller agree as follows:

## SECTION 1  DEFINITIONS

Section 1.1  Defined Terms

"Acceptance" means an acknowledgment that Seller has executed, indicating Seller's acceptance of Buyer's proposal to purchase a portfolio of Loans pursuant to the terms set forth in the Response.

"Accepted Servicing Practices" means with respect to any Loan, those mortgage servicing practices of prudent mortgage lending institutions that service mortgage loans of the same type as such Loan in the jurisdiction where the related Mortgaged Property is located.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the Person specified.

"Appraised Value" means the amount set forth in an appraisal in connection with the origination of each Loan as the value of the Mortgaged Property.

"Assignment of Mortgage" means an assignment of the Mortgage, notice of transfer or equivalent instrument, in recordable form, which when recorded is sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect of record the sale of the Mortgage to the Buyer, or its assignee.

"Bid Percentage" means a percentage of the Pool Balance, determined by Buyer in its sole discretion, on which the Purchase Price is based.

"Business Day" means any day other than (a) Saturday or Sunday, or (b) a day on which financial institutions in the States of Delaware or Illinois are authorized or required by law, executive order or governmental decree to be closed.

"Buyer" means Household Financial Services, Inc., a Delaware corporation, and its Affiliates as specified in the Response relating to a pool of Offered Loans.

"Closed End Loan" means a closed end mortgage loan.

"Credit File" means with respect to any Loan, the file containing those items listed in Exhibit B annexed hereto, and any additional documents required to be added thereto pursuant to this Agreement.

"Credit Limit" means with respect to each HELOC, the maximum amount permitted under the terms of the related Credit Line Agreement.

"Credit Line Agreement" means with respect to any HELOC, the related home equity line of credit agreement, account agreement and/or promissory note (if any) executed by the related Obligor and any amendment or modification thereof.

"Cut-off Date" means, with respect to each Offer, the date as of which the Principal Balance and the Pool Balance are determined.

"Due Date" means the day of the month on which each Monthly Payment is due on a Loan, exclusive of any days of grace.

"Due Diligence Period" means the period as agreed to by Buyer and Seller and ending when Buyer submits a Response unless otherwise agreed to in writing. During such period Seller shall make the Loan Documents and any information, records and files pertaining to the Offered Loans available to Buyer at its offices located in Atlanta, Georgia or at any other location mutually agreed upon by Buyer and Seller.

"ECOA" means the Equal Credit Opportunity Act, 15 U.S.C. § 1601.

"Escrow Payment" means with respect to any Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Obligor with the mortgagee pursuant to the Mortgage or any other document.

"Excluded Loans" means the Offered Loans owned by Seller and offered for sale to Buyer pursuant to an Offer, which Offered Loans Buyer elects not to purchase, and which Offered Loans shall be listed in Schedule A to the Response.

"Fannie Mae" means Fannie Mae.

"First Mortgage Loan" means with respect to each Offer those Loans secured by a valid Mortgage that represents a first lien.

"Freddie Mac" means Freddie Mac.

"GNMA" means the Governmental National Mortgage Association.

"HELOC" means a home equity line of credit.

"HFS Ineligible List" means the list of Persons that are ineligible to do business with Buyer, as such list is published by Buyer from time to time.

"Interest Rate Adjustment Date" means the date on which the Mortgage Interest Rate is adjusted with respect to each adjustable rate Loan. The next Interest Rate Adjustment Date is the date set forth on the Loan Schedule.

"IRS" means the Internal Revenue Service.

"Legal Fees" means with respect to any indemnified party, any and all fees, costs, and expenses of any kind reasonably incurred by such party or its counsel investigating, preparing for, defending against, or providing evidence, producing documents, or taking other action with respect to, any threatened or asserted claim.

"Legal File" means with respect to any Mortgage Loan, the file containing those items listed in Exhibit A annexed hereto, and any additional documents required to be added thereto pursuant to this Agreement.

"Loan" means each loan selected by Buyer to purchase from the Offered Loans owned by Seller and offered to Buyer pursuant to each Offer, which Loans collectively, shall be listed in the Offered Loan Schedule.

"Loan Documents" means all of Seller's original agreements with any Obligor of a Loan, and all of the following in the original (except as otherwise noted) to the extent they exist in Seller's loan files, for any Loan that Buyer proposes to buy pursuant to its Response: all loan applications, correspondence, general credit information, file maintenance information, payment histories, credit information files, records, executed notes (which may be copies), documents, disclosures, receipts, drafts, instruments, notices, acknowledgments, mortgages (which may be copies), deeds of trust (which may be copies), security deeds (which may be copies), title insurance policies, title opinions, property appraisals, property surveys, insurance policies, property insurance policies, mortgage insurance policies, flood insurance policies, guarantees, and any like and other information relating to the Loans that is maintained in individual loan files or on a loan-by-loan basis, including such data stored on microfilm, microfiche, magnetic tape, computer disc, or in any other form.

"Loan Schedule" means the list of Loans, consisting of the Offered Loans less any Excluded Loans.

"Loan-To-Value Ratio" or "LTV" means with respect to any Loan, the ratio of the outstanding principal amount of the Loan and, if the Loan purchased hereunder is secured by a second lien, any lien on the Mortgaged Property senior to the lien of the Loan as of the origination date to the lesser of (a) the Appraised Value of the Mortgaged Property and (b) if the Loan was made to finance the acquisition of the related Mortgaged Property, the purchase price of the Mortgaged Property, expressed as a percentage.

"Monthly Payment" means the scheduled monthly payment of principal and interest on a Loan.

"Mortgage" means, with respect to a Loan, any mortgage, deed of trust, security deed, or other similar instrument creating a lien on residential real property to secure repayment of such Loan, or a true and correct copy thereof.

"Mortgage File" means collectively, the Credit File and the Legal File for any Loan.

"Mortgage Interest Rate" means the annual rate of interest borne on a Note, net of any primary mortgage guaranty insurance premium.

"Mortgaged Property" means, with respect to each Mortgage, the property subject to such Mortgage.

"Note" means, with respect to a Loan, the original promissory note or Credit Line Agreement executed by the respective Obligor to evidence such Obligor's indebtedness under such Loan.

"Obligor" means, with respect to an Offered Loan, any person obligated for payment of such Offered Loan or who has transferred or assigned any property interest to Seller to secure payment of such Offered Loan.

"Offer" means each offer from Seller to Buyer to sell a portfolio of Offered Loans and the right to service each such Offered Loan pursuant to the procedures set forth in Section 2.1, which Offer shall include an Offered Loan Schedule.

"Offer Date" means, with respect to each Offer, the date on which Seller sends such Offer to Buyer.

"Offered Loan" means any mortgage loan that is secured by a first or second position lien on completed, one-to-four family residential real estate, and that Seller owns and offers to Buyer to purchase pursuant to an Offer.

"Offered Loan Schedule" means the schedule of Offered Loans attached to the Offer, which lists to the extent and as available the mapping document information relating to each Offered Loan required to be included in each Offer, as set forth in Schedule 1 to this Agreement, and which shall be in electronic format and, if requested by Buyer, hard copy.

"PHL" means Personal Home Loan that is a 100% combined loan to value, fixed rate, closed-end loan for which no appraisal and no title insurance policy are obtained.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability partnership, limited liability company, unincorporated organization or government or any agency or political subdivision thereof.

"Pool Balance" means, with respect to each Offer and each portfolio of Loans to be purchased pursuant to this Agreement, the aggregate outstanding Principal Balance of the Loans in such portfolio as of the Cut-off Date.

"Premium" means the product of the Principal Balance times the Bid Percentage, minus the Principal Balance.

"Principal Balance" means, with respect to a Loan and a particular Offer, the unpaid principal balance of such Loan as of the close of business on the Cut-off Date, as shown on the books and records of Seller; provided that the Principal Balance shall not include any accrued but unpaid fees or charges.

"Purchase Price" means, the price paid by Buyer for the Loans acquired pursuant to the Response, which shall be calculated according to the following formula:

    (a)    the product of

        (i)    the Bid Percentage and

        (ii)    the Pool Balance minus the aggregate amount, if any, of all payments of principal made to and retained by Seller on the Loans acquired from the Cut-off Date up to, but not including, the Settlement Date

    (b)    plus

        (i)    accrued but unpaid interest on each of the Loans at the applicable per annum interest rate, as set forth on the Loan Schedule from the paid-to-date of interest up to, but not including the Settlement Date.

"RESPA" means the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq.

"Response" means the letter from Buyer to Seller setting forth the Bid Percentage and attaching as Schedule A, a list of any Excluded Loans.

"Subordinate Mortgage Loan" means with respect to each Offer those Loans secured by a Mortgage which is not a First Mortgage Loan.

"Seller" means American Freedom Mortgage, a Georgia corporation.

"Service Transfer Date" means, unless otherwise agreed by the parties, the date which is 15 days after the date on which Seller sends its notices pursuant to Section 6.1 and on which Seller transfers to Buyer or Buyer's designee all servicing responsibilities relating to all the Loans sold on the corresponding Settlement Date pursuant to Section 2.6.

"Settlement" means, with respect to each portfolio of Loans to be sold pursuant to this Agreement, the satisfaction of the conditions set forth in Section 7, and the sale and purchase of, such portfolio of Loans.

"Settlement Date" means each date mutually agreed upon by the parties on which Seller sells and Buyer acquires a portfolio of Loans.

"TILA" means the Truth in Lending Act, 15 U.S.C. § 1600 et seq.

Section 1.2 Other Terms

(a) Accounting and financial terms used herein and not otherwise defined in this Agreement shall be construed in accordance with generally accepted accounting definitions and principles as consistently applied.

(b) Words used in this Agreement in the singular, where the context so permits, shall be deemed to include the plural and vice versa.

## SECTION 2 PURCHASE OF LOANS AND TRANSFER OF SERVICING

Section 2.1 Offer to Sell.

(a) From time to time, Seller may submit an Offer to Buyer and Buyer may agree to buy any or all of the Offered Loans listed in such Offer and the right to service those Offered Loans pursuant to the terms of this Agreement and any Schedules and Exhibits hereto. Such sale and transfer shall be subject to the provisions of this Agreement.

(b) Each Offer shall be sent to Buyer by hand delivery, overnight courier or modem and shall be accompanied by a letter notifying Buyer that Seller is making an Offer to sell the Offered Loans at a Purchase Price based on a Bid Percentage, which shall be determined by Buyer, and which shall be subject to acceptance by Seller. Each Offer shall attach an Offered Loan Schedule, which shall include mapping document information relating to each Offered Loan

according to the format and criteria set forth in Schedule 1 to this Agreement. Seller shall bear all costs of sending the Offer and Offered Loan Schedule to Buyer.

Section 2.2  Buyer's Response and Seller's Acceptance.

(a) If Buyer chooses to purchase any or all of the Offered Loans, Buyer shall notify Seller within a reasonable period of time after the end of the Due Diligence Period via the Response. The Response will set forth the terms and conditions of the proposed purchase including, without limitation, the proposed Bid Percentage and whether HFS and its Affiliates shall be the Buyer with respect to such pool of Offered Loans.

(b) Seller shall indicate its acceptance of Buyer's Response by executing and returning the Response to Buyer within the time frame set forth therein. If Seller does not execute and return the Response within such time frame, Buyer's proposal to purchase the Loans pursuant to the terms of the Response shall automatically expire, unless Buyer agrees to extend the period for acceptance of the Response.

(c) By executing the Response, Seller agrees to sell the Loans, or cause the Loans to be sold to Buyer pursuant to and in accordance with the terms of the Response and this Agreement.

Section 2.3  Purchase of Loans and Servicing Rights.

(a) Subject to the terms and conditions set forth in this Agreement,

(i) Seller shall sell, transfer, assign, and convey to Buyer, without recourse, but subject to the terms of this Agreement, and Buyer shall purchase and take on the Settlement Date, all of Seller's right, title, and interest in and to the Loans listed in the Response;

(ii) Seller shall sell, transfer, assign, and convey to Buyer, and Buyer shall purchase and take on the Settlement Date, all of Seller's right, title, and interest in and to all escrow deposits held in connection with the Loans listed in the Response; and

(iii) Seller shall also irrevocably assign to Buyer, and Buyer shall take on the Settlement Date, Seller's right to service each Loan sold pursuant to the Response and to collect all servicing and ancillary servicing fees in connection with such Loan.

Section 2.4  Purchase Price.  The Purchase Price for the Loans purchased at each Settlement shall be based on the Bid Percentage set forth in the Response and shall be calculated according to the formula set forth in the definition of the term Purchase Price.

Section 2.5  Premium Rebate.  In the event that a Premium is paid by the Buyer to the Seller on a Loan and such Loan is prepaid in full by the Borrower, other than by a refinancing by the Buyer or any of its subsidiaries or affiliates, within twelve (12) months of Settlement Date, the

7

Seller shall, upon demand by the Buyer, refund to the Buyer the Premium paid by the Buyer to the Seller as follows: if prepayment in full is within one (1) month of the Settlement Date, 12/12ths of the Premium shall be refunded; if prepayment in full is between one (1) and two (2) months of the Settlement Date, 11/12ths of the Premium shall be refunded; if prepayment in full is between two (2) and three (3) months of the Settlement Date, 10/12ths of the Premium shall be refunded; if prepayment in full is between three (3) and four (4) months of the Settlement Date, 9/12ths of the Premium shall be refunded; if prepayment in full is between four (4) and five (5) months of the Settlement Date, 8/12ths of the Premium shall be refunded; if prepayment in full is between five (5) and six (6)months of the Settlement Date, 7/12ths of the Premium shall be refunded; if prepayment in full is between six (6) and seven (7) months of the Settlement Date, 6/12ths of the Premium shall be refunded; if prepayment in full is between seven (7) and eight (8) months of the Settlement Date, 5/12ths of the Premium shall be refunded; if prepayment in full is between eight (8) and nine(9) months of the Settlement Date, 4/12ths of the Premium shall be refunded; if prepayment in full is between nine (9) and ten (10) months of the Settlement Date, 3/12ths of the Premium shall be refunded; if prepayment in full is between ten (10) and eleven (11) months of the Settlement Date, 2/12ths of the Premium shall be refunded; if prepayment in full is between eleven (11) and twelve (12) months of the Settlement Date, 1/12th of the Premium shall be refunded. In the event any Loan is prepaid in full later than twelve (12) months from the Settlement Date of such Loan, no refund shall be due. In the event the Note carries a prepayment penalty, the Buyer agrees to recapture the Premium rebate from the proceeds of the prepayment penalty and then from Seller, if there is any deficient balance according to the refund calculation specified above.

Section 2.6 <u>Transfer of Servicing</u>. As of each Settlement Date, Seller shall transfer to Buyer any and all rights to service the Loans sold on the related Settlement Date, including but not limited to Seller's right to receive all payments and receivables with respect to the Loans, ownership of Escrow Payments, and all servicing rights as owner and holder of the Loans. In connection therewith, upon execution of this Agreement, Seller shall execute each Limited Power of Attorney attached as Exhibit C hereto and shall deliver them to HFS. Notwithstanding the foregoing, Seller shall continue to service the Loans for Buyer following the Settlement Date and until the corresponding Service Transfer Date as set forth in Section 5.1, and Buyer shall assume responsibility for servicing the Loans on and after such Service Transfer Date. Seller shall ensure that all escrow balances are received by Buyer within three (3) days of the Service Transfer Date. If such balances are not received by Buyer within three (3) days, Seller shall remit to Buyer in immediately available funds, an amount equal to said balances.

## SECTION 3 SETTLEMENT

Section 3.1 <u>Place and Time of Settlement</u>. Each Settlement shall take place via facsimile and wire transfer with original documents delivered via overnight courier on the Settlement Date, which shall be within 2 Business Days of the satisfaction of all conditions to Settlement, as set forth herein, or on such other day as mutually agreed to by the parties.

Section 3.2 <u>Seller's Deliveries at Settlement</u>. On or before each Settlement, Seller shall deliver the following to Buyer:

(a) the form of notice of servicing transfer, to be sent by Seller pursuant to Section 6.1 for each Loan as required by RESPA, which form shall indicate the date on which it shall be sent by Seller;

(b) the Mortgage File with respect to each Loan sold at such Settlement, the contents of which are subject to the approval of Buyer and its legal counsel as to proper form and execution provided, however, to the extent Seller continues to service the Loans after Settlement, the Credit File shall be retained by Seller and delivered to Buyer ten (10) days prior to the Service Transfer Date; and

(c) all other documents, instruments and writings required to be delivered by Seller prior to or at such Settlement pursuant to Section 7.1 of this Agreement or as reasonably requested by Buyer.

Section 3.3  Buyer's Deliveries at Settlement.  At each Settlement, Buyer shall deliver the Purchase Price for the Loans sold at such Settlement by wire transfer of immediately available funds in U.S. dollars to the account designated by Seller.

## SECTION 4  REPRESENTATIONS AND WARRANTIES

Section 4.1  General Representations and Warranties of Seller.  As of the date hereof, and as of each Settlement Date, Seller represents and warrants as follows:

(a)  Organization.  Seller is a corporation, duly organized, validly existing, and in good standing under the laws of the State of Georgia , and is qualified and authorized to transact business in, and is in good standing under the laws of, each jurisdiction in which any Mortgaged Property is located or is otherwise exempt under applicable law from such qualification. Seller has the requisite corporate power and authority to own and operate its properties, to carry on its business as it is now being conducted, and to consummate the transactions contemplated by this Agreement.

(b)  Authorization.  Seller has the requisite corporate power and authority to execute and deliver this Agreement and the Limited Powers of Attorney attached as Exhibit C, and to consummate the transactions contemplated hereby.  The execution, delivery, and performance of this Agreement and the Limited Power of Attorney attached as Exhibit C, and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action, and no other corporate proceedings on the part of Seller are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement and the Limited Powers of Attorney attached as Exhibit C, have been duly executed and delivered by Seller and constitute legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their terms, except that such enforcement may be affected by bankruptcy, by other insolvency laws, or by general principles of equity.

(c)  Ordinary Course of Business.  The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of Seller, and the transfer,

9

assignment and conveyance of the Notes and the Mortgages by Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction.

(d) No Conflict or Violation. The execution and delivery of this Agreement by Seller does not, and the performance of this Agreement by Seller will not, (i) result in a violation of or conflict with any provisions of the charter or by-laws or equivalent governing instruments of Seller, (ii) violate any law, rule, regulation, code, ordinance, judgment, injunction, order, writ, decree, or ruling applicable to Seller, or (iii) conflict with or violate any agreement, permit, concession, grant, franchise, license, or other governmental authorization or approval necessary for sale of the Loans by Seller.

(e) Litigation. No action, suit, proceeding, or governmental investigation or inquiry is currently pending, or to the knowledge of Seller, threatened against Seller which, if adversely determined, would have a material adverse effect on the business, combined assets or financial condition of Seller or on the Loans or would prevent the consummation of the transactions contemplated by this Agreement.

(f) Financial Condition. Seller has previously furnished Buyer with Seller's most recent audited financial statements, together with the respective reports thereon of the Seller's independent public accountants, and Seller's most recent unaudited financial statements, each of which has been prepared in accordance with generally accepted accounting principles. Each of the balance sheets included in the financial statements sets forth Seller's financial condition as of the date thereof, and there have been no material adverse changes in Seller's business or financial condition since that date.

(g) Accuracy of Statements. Neither this Agreement, nor any statement, report, or other document furnished or to be furnished pursuant to this Agreement, or in connection with the transaction contemplated hereby, contains any untrue statement of fact, or omits to state a fact, necessary to make the statements contained therein not misleading.

(h) Fidelity Bond. Upon request Seller will deliver to Buyer a true and correct copy of Seller's fidelity bond and Seller's errors and omissions policy, as currently in effect, the amounts and coverages of both of which will be acceptable to Buyer. Seller shall, at its own expense, maintain a fidelity bond and an errors and omissions policy, in amounts at least as great as, and with the coverages at least as broad as, those currently in effect. Seller shall upon request furnish proof of such coverage at or before the first Settlement and, upon request, annually thereafter.

(i) Ability to Perform: Solvency. Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement. Seller is solvent and sale of the Loans will not cause Seller to become insolvent. The sale of the Loans is not undertaken with the intent to hinder, delay or defraud any of the Seller's creditors.

(j) <u>No Consent Required</u>. No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Seller of or compliance by Seller with this Agreement or the Loans, or the sale of the Loans to the Buyer or the consummation of the transactions contemplated by this Agreement, or if required, such approval has been obtained prior to each Settlement Date.

(k) <u>Selection Process</u>. The Loans were not intentionally selected in a manner so as to adversely affect the interests of the Buyer.

(l) <u>Commissions to Third Parties</u>. Seller has not dealt with any broker or agent or other Person who might be entitled to a fee, commission or compensation in connection with this transaction other than the Buyer except as Seller has previously disclosed to Buyer in writing.

(m) <u>Fair Consideration</u>. The consideration received by Seller upon the sale of the Loans under this Agreement constitutes fair consideration and reasonably equivalent value for the Loans.

(n) <u>No Personal Solicitation</u>. For a period of three (3) years from and after each Settlement Date, Seller agrees that it will not take any action or permit or cause any action to be taken by any of its agents and Affiliates, or by any independent contractors or independent mortgage brokerage companies on Seller's behalf, to personally, by telephone or mail, solicit the borrower or Obligor under any Loan for any purpose whatsoever, including to solicit an application for a mortgage or home equity loan, or to refinance a Loan, in whole or in part, without the prior written consent of the Buyer. It is understood and agreed that all rights and benefits relating to the solicitation of any Obligors and the attendant rights, title and interest in and to the list of such Obligors and data relating to their mortgages (including insurance renewal dates) shall be transferred to the Buyer pursuant hereto on each Settlement Date and Seller shall take no action to undermine these rights and benefits. Notwithstanding the foregoing, it is understood and agreed that promotions undertaken by Seller or any Affiliate or agent of Seller which are directed to the general public at large, including, without limitation, mass mailing based on commercially acquired mailings lists, newspaper, radio and television advertisements shall not constitute solicitation under this paragraph.

(o) <u>HUD Approval</u>. Seller is a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Section 203 and 211 of the National Housing Act, as amended.

Section 4.2 <u>Representations and Warranties of Seller Regarding the Offered Loans</u>. With respect to each Offer, Seller represents and warrants to, and covenants with Buyer that, as of the corresponding Offer Date:

(a) <u>Accuracy of Statements</u>. Neither this Agreement, nor any statement, report, or other document furnished or to be furnished pursuant to this Agreement (including the Offered Loan Schedule and the Loan Documents), nor any other document furnished in connection with an Offer contains any untrue statement of fact, or omits to state a fact, necessary to make the statements contained therein not misleading. The information contained in the Offered Loan Schedule and all

information provided regarding delinquencies in the Offered Loans are true and correct in all respects.

(b) Origination; No Misstatement or Fraud. Each of Offered Loans meets the underwriting standards of Seller, which standards are set forth in Schedule 2 to this Agreement, and were underwritten in strict accordance therewith. Each Loan was originated by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Section 203 and 211 of the National Housing Act or a savings and Loan association, a savings bank, a commercial bank, a credit union, an insurance company, or similar institution which is supervised and examined by a Federal or State authority. The Note, the Mortgage and all other documents contained in the Legal Files are on Fannie Mae or Freddie Mac uniform instruments or are on forms acceptable to Fannie Mae or Freddie Mac. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact and do not omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud was committed in connection with the origination of the Loan. Seller has not made any representations to the Obligor that are inconsistent with the mortgage instruments used.

(c) Genuineness of Signatures. The Note and the Mortgage are genuine, and each is the legal, valid and binding obligation of the Obligor thereunder, enforceable in accordance with its terms, subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the rules of equity, including those respecting the availability of specific performance. All parties to the Note and the Mortgage and any other related agreement had legal capacity to enter into the Loan and to execute and deliver the Note and the Mortgage and any other related agreement, and the Note and the Mortgage and any other related agreement have been duly and properly executed by such parties. All certified copies of original documents are true copies and meet the applicable requirements and specifications of this Agreement and any other requirements that Buyer has reasonably made of Seller.

Section 4.3  Representations and Warranties of Seller Regarding the Loans. With respect to each Loan, Seller represents and warrants to, and covenants with Buyer that, as of the Settlement Date on which such Loan is sold:

(a) Title to Loans. Seller has good title to and is the sole owner of record and holder of the Loan and the indebtedness evidenced by each Note. Unless otherwise disclosed in the Loan Documents or the Offered Loan Schedule, Seller is the original mortgagee or assignee of the Mortgage, and there has been no more than one prior assignment and no sale, or hypothecation by Seller of the Loan. The Loan is not assigned or pledged, and Seller has good, indefeasible and marketable title thereto, and has full right to transfer and sell the Loan to the Buyer free and clear of any encumbrance, equity interest, participation interest, lien, pledge, charge, claim or security interest, and has full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign each Loan pursuant to this Agreement and immediately upon the sale of each Loan, Buyer will own such Loan free and clear of any encumbrance, equity interest, participation interest, lien, pledge, charge, claim or security interest.

(b) Accuracy of the Offered Loan Schedule. The Loan is as described in the Offered Loan Schedule delivered by Seller to Buyer, and the information contained in the Offered Loan Schedule is true and correct as of the Settlement Date.

(c) Payments. Unless otherwise specified by Seller in the Offered Loan Schedule delivered to Buyer pursuant to Section 2.1 hereof or otherwise specifically agreed to by Buyer at the Settlement Date, as of the Settlement Date, no Loan is 30 or more days delinquent (determined on a contractual basis) and no Loan will have been 30 or more days delinquent (determined on a contractual basis) more than once during the 12 months preceding the Settlement Date. The borrower has made, or shall make when due, as the case may be, the first monthly payment due after origination on or prior to its Due Date.

(d) No Outstanding Charges. There are no defaults in complying with the terms of the Mortgage, and all taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing have been paid, or an escrow of funds has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable. Seller has not advanced funds, or induced or solicited or knowingly received any advance of funds by a party other than the Obligor, direct or indirectly, for the payment of any amount required under the Loan, except for interest accruing from the date of the Note or date of disbursement of the Loan proceeds, whichever occurred later, to the day which precedes by one month the Due Date of the first Monthly Payment.

(e) Original Terms Unmodified. The terms of the Note and Mortgage have not been impaired, waived, altered or modified in any respect, except by a written instrument which has been recorded, if necessary to protect the interests of the Buyer. The substance of any such waiver, alteration or modification has been approved by the title insurer, to the extent required by the policy, and its terms are reflected on the Loan Schedule. No Obligor has been released, in whole or in part, except in connection with an assumption agreement approved by the title insurer, to the extent required by the policy, and which assumption agreement is part of the Legal File.

(f) Absence of Defenses. The Mortgage and the Note are not subject to any right of rescission, set-off, counterclaim, or defense (including the defense of deceptive trade practice or usury), based on the invalidity or unenforceability of the Note and/or Mortgage or on any conduct of Seller or any of its officers, employees, representatives, or Affiliates in originating or servicing the Loan prior to the Settlement Date. Nor will the operation of any of the terms of the Mortgage or Note, or the exercise of any right thereunder, render the Mortgage or Note unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim, or defense (including the defense of usury) based on any such invalidity, unenforceability or conduct. No right of rescission, set-off, counterclaim, or defense with respect thereto has been asserted to Seller or, to Seller's knowledge, has been asserted to any other person. The Obligor with respect to each Note is not currently subject to a personal bankruptcy proceeding.

(g) Hazard and Flood Insurance. Pursuant to the terms of the Mortgage, all improvements upon the Mortgaged Property are insured by an insurer acceptable to Fannie Mae

13

against loss by fire and such other risks (excluding mud slides and earthquakes) as are usually insured against in the broad form of extended coverage hazard insurance from time to time available, including flood hazards if upon origination of the Loan, the Mortgaged Property was in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards (and if flood insurance was required by federal regulation and such flood insurance has been made available). All such insurance policies (collectively, the "hazard insurance policy") meet the requirements of the current guidelines of the Federal Insurance Administration, conform to the requirements of the Fannie Mae Sellers' Guide and the Fannie Mae Servicers' Guide, and are a standard policy of insurance for the locale where the Mortgaged Property is located. The amount of the insurance is at least in the amount of the full insurable value of the Mortgaged Property on a replacement cost basis or the unpaid balance of the Mortgage Loan, whichever is less. The hazard insurance policy names (and will name) the Obligor as the insured and contains a standard mortgagee loss payable clause in favor of Seller (or Seller's servicer) and its successors and assigns. The Mortgage obligates the Obligor thereunder to maintain the hazard insurance policy at the Obligor's cost and expense, and on the Obligor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at such Obligor's cost and expense, and to seek reimbursement therefor from the Obligor. Where required by state law or regulation, the Obligor has been given an opportunity to choose the carrier of the required hazard insurance, provided the policy is not a "master" or "blanket" hazard insurance policy covering a condominium, or any hazard insurance policy covering the common facilities of a planned unit development. The hazard insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect and inure to the benefit of the Buyer upon the consummation of the transactions contemplated by this Agreement. Seller has not engaged in, and has no knowledge of the Obligor's or any subservicer's having engaged in, any act or omission which would impair the coverage of any such policy, the benefits of the endorsement provided for therein, or the validity and binding effect of either. In connection with the issuance of the hazard insurance policy, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other person or entity, and no such unlawful items have been received, retained or realized by Seller.

(h)    Compliance with Applicable Laws. Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity or disclosure laws applicable to the Loan have been complied with by Seller and, if Seller is not the originator of any such Loan, by the originator of such Loan, and the consummation of the transactions contemplated hereby will not involve the violation of any such laws or regulations.

(i)    No Satisfaction of Mortgage or Note. Neither the Mortgage nor the Note has been satisfied, cancelled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission. Seller has not waived the performance by the Obligor of any action, if the Obligor's failure to perform such action would cause the Mortgage Loan to be in default, nor has Seller waived any default resulting from any action or inaction by the Obligor.

(j) <u>Location and Type of Mortgaged Property</u>. The Mortgaged Property consists of a single parcel of real property with a single family residence erected thereon, or a two to four-family dwelling, or an individual condominium unit in a low-rise or high-rise condominium project, or an individual unit in a planned unit development. The Mortgaged Property is either a fee simple estate or a long-term residential lease. If the Loan is secured by a long-term residential lease, (A) the terms of such lease expressly permit the mortgaging of the leasehold estate, the assignment of the lease without the lessor's consent (or the lessor's consent has been obtained and such consent is in the Mortgage File) and the acquisition by the holder of the Mortgage of the rights of the lessee upon foreclosure or assignment in lieu of foreclosure or provide the holder of the Mortgage with substantially similar protection; (B) the terms of such lease do not (i) allow the termination thereof upon the lessee's default without the holder of the Mortgage being entitled to receive written notice of, and opportunity to cure, such default, (ii) allow the termination of a lease in the event of damage or destruction as long as the Mortgage is in existence or (iii) prohibit the holder of the Mortgage from being insured under the hazard insurance policy relating to the Mortgaged Property; (C) the original term of such lease is not less than 15 years; (D) the term of such lease does not terminate earlier than five years after the maturity date of the Note; and (E) the Mortgaged Property is located in a jurisdiction in which the use of leasehold estates for residential properties is a widely-accepted practice. No portion of the Mortgaged Property is used for commercial purposes.

(k)  <u>Valid Lien</u>.  The Mortgage for any First Mortgage Loan creates a valid, subsisting, enforceable and perfected first lien on the Mortgaged Property, and the Mortgage for any Subordinate Mortgage Loan creates a valid, subsisting, enforceable and perfected lien on the Mortgaged Property, and in each case includes all buildings on the Mortgaged Property and all installations and mechanical, electrical, plumbing, heating and air conditioning systems located in or annexed to such buildings, and all additions, alterations and replacements made at any time with respect to the foregoing. The lien of the Mortgage is subject only to "Permitted Exceptions," which consist of the following:

(1)    the lien of current real property taxes and assessments not yet due and payable;

(2)    covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording acceptable to prudent mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Loan and referred to or otherwise considered in the appraisal made for the originator of the Loan;

(3)    other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property; and

(4)    a valid lien of a higher priority in the case of a Subordinate Mortgage Loan.

Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with a First Mortgage Loan establishes and creates a valid, subsisting, enforceable and perfected first lien and first priority security interest on the property described therein, and with respect to a Subordinate Mortgage Loan, a perfected security interest, and Seller has full right to sell and assign the same to the Buyer. Except as noted on the Loan Schedule, for any First Mortgage Loan the Mortgaged Property was not, as of the respective date of origination of said First Mortgage Loan, subject to a mortgage, deed of trust, deed to secure debt or other security instrument creating a lien, subordinate to the lien of the Mortgage.

(l) Validity of Mortgage Documents; No Misstatements or Fraud. The Note and the Mortgage and every other agreement, if any, executed and delivered by the Obligor in connection with the Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms. All parties to the Note, the Mortgage and each other such related agreement had legal capacity to enter into the Loan and to execute and deliver the Note, the Mortgage and each other such related agreement, and the Note, the Mortgage and each other such related agreement have been duly and properly executed by the respective Obligors. Seller has reviewed all of the documents constituting the Mortgage File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud was committed in connection with the origination of the Mortgage Loan.

(m) Full Disbursement of Proceeds. Each Closed End Loan has been closed, and the proceeds of the Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Loan and the recording of the Mortgage were paid, and the Obligor is not entitled to any refund of any amounts paid or due under the Note or Mortgage.

(n) Doing Business. All parties which have had an interest in the Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (1) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (2) (a) organized under the laws of such state, or (b) qualified to do business in such state, or (c) federal savings and loan associations, savings banks, or national banks having principal offices in such state, or (d) not doing business in such state.

(o) LTV. The initial principal balance of each Loan was less than or equal to 115% of the lesser of the Appraised Value of the Mortgaged Property at the time the Loan was originated or the sales price of the Mortgaged Property.

(p) Title Insurance. Except for PHL loans, the Loan is covered by either (a) an attorney's opinion of title and abstract of title the form and substance of which is acceptable to

16

Fannie Mae or (b) an ALTA lender's title insurance policy or other generally acceptable form of policy of insurance issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring Seller, its successors and assigns, as to the first priority lien of the Mortgage in the original principal amount of a First Mortgage Loan, and as to the applicable priority lien on the Mortgage in the original principal amount of a Subordinate Mortgage Loan, subject only to the Permitted Exceptions and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment in the Mortgage Interest Rate and Monthly Payment. Additionally, such lender's title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Mortgaged Property or any interest therein. Where required by state law or regulation, the Obligor has been given the opportunity to choose the carrier of such lender's title insurance policy. Seller, its successors and assigns are the sole insureds of such lender's title insurance policy, and such lender's title insurance policy is valid and remains in full force and effect and will be in full force and effect upon the sale of the Loan to the Buyer. No claims have been made under such lender's title insurance policy, and no prior holder of the mortgage, including Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy. In connection with the issuance of such lender's title insurance policy, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other person or entity, and no such unlawful items have been received, retained or realized by Seller.

(q)  No Defaults.  There is no default, breach, violation or event of acceleration existing under the Mortgage or the Note or related documents and no event which, with the passage of time or with notice and the expiration of any applicable grace or cure period, would constitute a default, breach, violation or event of acceleration, and neither Seller nor its predecessors have waived any default, breach, violation or event of acceleration.

(r)  No Mechanics' Liens.  There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under the law could give rise to such liens) affecting the related Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage.

(s)  Location of Improvements; No Encroachments.  All improvements which were considered in determining the Appraised Value of the Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property and no improvements on adjoining properties encroach upon the Mortgaged Property. No improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning law or regulation; provided, that in no event shall a legal non-conforming use of the Mortgaged Property be considered a violation of any such zoning law or regulation.

(t)  Payment Terms.  For fixed-rate Loans, the Note is payable in equal monthly installments (other than the last payment) of principal and interest.  For adjustable-rate Loans, the Mortgage Interest Rate is adjusted in accordance with the terms of the Note and the Note is payable each month and, during an adjustment period or initial period, in equal monthly installments of principal and interest.  All required notices of interest rate and payment amount adjustments have

been sent to the Obligor on a timely basis and the computations of such adjustments were properly calculated. Installments of interest are subject to change due to the adjustments to the Mortgage Interest Rate of each Interest Rate Adjustment, with interest calculated and payable in arrears, sufficient to amortize the Mortgage Loan fully by the stated maturity date, over an original term of not more than thirty years from commencement of amortization. All Mortgage interest rate adjustments have been made in strict compliance with state and federal law and the terms of the related Note. Any interest required to be paid pursuant to state and local law has been properly paid and credited.

(u) Customary Provisions. The Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure. Upon default by an Obligor on a Loan and foreclosure on, or trustee's sale of, the Mortgaged Property pursuant to the proper procedures the holder of the Loan will be able to deliver good and merchantable title to the Mortgaged Property. There is no homestead or other exemption available to the Obligor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage subject to applicable federal and state laws and judicial precedent with respect to bankruptcy and right of redemption.

(v) Occupancy of the Mortgaged Property. Unless otherwise specified by Seller in the Offered Loan Schedule delivered pursuant to Section 2.1 hereof, or otherwise agreed to by Buyer at the Settlement Date, the Mortgaged Property is lawfully occupied by the Obligor under the laws of the applicable jurisdiction. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities.

(w) No Additional Collateral. The Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage and the security interest of any applicable security agreement or chattel mortgage referred to in the "Valid Lien" representation above.

(x) Deeds of Trust. In the event the Mortgage constitutes a deed of trust, a trustee, authorized and duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Buyer to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Obligor.

(y) Due on Sale. The Mortgage for a First Mortgage Loan contains a provision for the acceleration of the payment of the unpaid principal balance of the Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the mortgagee thereunder, at the option of the mortgagee. This provision provides that the mortgagee cannot exercise its option if either (a) the exercise of such option is prohibited by federal law or (b) (i) the Obligor causes to be submitted to the mortgagee information required by the mortgagee to evaluate

18

the intended transferee as if a new loan were being made to such transferee and (ii) the mortgagee reasonably determines that the mortgagee's security will not be impaired by the assumption of such Loan by the transferee and that the risk of breach of any covenant or agreement in the Loan documents is acceptable to the mortgagee.  To the best of Seller's knowledge, such provision is enforceable.

(z)  <u>Transfer of Loans</u>.  Each of the Mortgage and the Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located.

(aa)  <u>No Buydown Provisions; No Graduated Payments or Contingent Interests</u>.  The Loan does not contain provisions pursuant to which Monthly Payments are paid or partially paid with funds deposited in any separate account established by Seller, the Obligor or anyone on behalf of the Obligor, or paid by any source other than the Obligor nor does it contain any other similar provisions currently in effect which may constitute a "buydown" provision.  The Loan is not a graduated payment mortgage loan and the Loan does not have a shared appreciation or other contingent interest feature.

(bb)  <u>Consolidation of Future Advances</u>.  Any future advances made to the Obligor prior to the Offer Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term.  The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first lien priority, if a First Mortgage Loan, or as having the applicable lien priority, if a Subordinate Mortgage Loan, by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to the Buyer. The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan.

(cc)  <u>Mortgaged Property Undamaged; No Condemnation Proceedings</u>.  There is no proceeding pending or, to the best of Seller's knowledge, threatened for the total or partial condemnation of the Mortgaged Property.  The Mortgaged Property is undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty so as to affect adversely the value of the Mortgaged Property as security for the Loan or the use for which the premises were intended and each Mortgaged Property is in good repair.  There have not been any condemnation proceedings with respect to the Mortgaged Property and Seller has no knowledge of any such proceedings in the future.

(dd)  <u>Collection Practices; Escrow Deposits</u>.  The origination, servicing and collection practices used by Seller with respect to the Loan have been in accordance with Accepted Servicing Practices and are in all respects in compliance with all applicable laws and regulations. With respect to escrow deposits and Escrow Payments, all such payments are in possession of Seller or the servicer of such Loan and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made.  All Escrow Payments have been collected in full compliance with state and federal law.  Unless prohibited by applicable law, an escrow of funds has been established in an amount sufficient to pay for every item which remains

unpaid and which has been assessed but is not yet due and payable. No escrow deposits or Escrow Payments or other charges or payments due Seller have been capitalized under the Mortgage or the Note.

(ee) Appraisals. Except for PHL loans, Seller has delivered to Buyer an appraisal of the Mortgaged Property signed prior to the approval of the Mortgage application by a qualified appraiser, who (i) is licensed in the state where the Mortgaged Property is located, (ii) as of the applicable Settlement Date, is acceptable to Buyer, (iii) has no interest, direct or indirect, in the Mortgaged Property or in any loan on the security thereof, and (iv) does not receive compensation that is affected by the approval or disapproval of the Loan. The appraisal shall be completed in compliance with the Uniform Standards of Professional Appraisal Practice, and all applicable federal and state laws and regulations.

(ff) Soldiers' and Sailors' Relief Act. The Obligor has not notified the Seller and the Seller has no knowledge of any relief requested or allowed to, the Obligor under the Soldiers' and Sailors' Civil Relief Act of 1940.

(gg) Environmental Matters. To the best of the Seller's knowledge, there exists no violation of any local, state or federal environmental law, rule or regulation in respect of the Mortgaged Property which violation has or could have a material adverse effect on the market value of such Mortgaged Property. Seller has no knowledge of any pending action or proceeding directly involving the related Mortgaged Property in which compliance with any environmental law, rule or regulation is in issue; and, to the best of Seller's knowledge, nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to the use and enjoyment of such Mortgaged Property.

(hh) Obligor Acknowledgment. The Obligor has executed a statement to the effect that the Obligor has received all disclosure materials required by applicable law with respect to the making of adjustable rate mortgage loans. Seller shall maintain or cause to be maintained such statement in the Credit File.

(ii) No Construction Loans. The Loan was not made in connection with (a) the construction or rehabilitation of a Mortgaged Property or (b) facilitating the trade-in or exchange of a Mortgaged Property.

(jj) Selection. The Loans were not selected for inclusion under this Agreement from among the Seller's mortgage loan portfolio on any basis which would have an adverse affect on the interests of the Buyer.

(kk) Circumstances Affecting Value, Marketability or Prepayment. Except as otherwise disclosed to the Buyer, Seller has no knowledge of any circumstances or conditions with respect to the Mortgage, the Mortgaged Property, the Obligor, or the Obligor's credit standing that could reasonably be expected to adversely affect the value or the marketability of any Mortgaged Property or Loan, subject to the economic and geological conditions generally and specifically to the area in which the Mortgaged Property is located.

(ll)     Right of Recission.  With respect to refinance Loans, the borrower's right of rescission has not been waived.

(mm)   No Negative Amortization.  The Loan is not subject to, or potentially subject to, negative amortization.

(nn)    North Carolina High-Cost Home Loans.  The Loan is not a "high-cost home loan" as defined by Section 24.1.1 of the North Carolina General Statutes.

(oo)    HFS Ineligible List.  No Person listed on the most recently published HFS Ineligible List was involved, directly or indirectly in originating the Loan.

Section 4.4  General Representations and Warranties of Buyer.  As of the date hereof, and as of each Settlement Date, Buyer represents and warrants as follows:

(a)  Organization.  Buyer is a corporation, duly organized, validly existing, and in good standing under the laws of the state of its incorporation, and is qualified and authorized to transact business in, and is in good standing under the laws of, each jurisdiction in which any Mortgaged Property is located or is otherwise exempt under applicable law from such qualification. Buyer has the requisite corporate power and authority to own and operate its properties, to carry on its business as it is now being conducted, and to consummate the transactions contemplated by this Agreement.

(b)  Authorization of this Agreement.  Buyer has the requisite corporate power and authority to execute and deliver this Agreement, and to consummate the transactions contemplated hereby.  The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporation action, and no other corporate proceedings on the part of Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Buyer and constitutes a legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except that such enforcement may be affected by bankruptcy, by other insolvency laws, or by general principles of equity.

(c)  No Conflict or Violation.  The execution and delivery of this Agreement by Buyer does not, and the performance of this Agreement by Buyer will not, (i) result in a violation of or conflict with any provisions of the charter or by-laws or equivalent governing instruments of Buyer, (ii) violate any law, rule, regulation, code, ordinance, judgment, injunction, order, writ, decree, or ruling applicable to Buyer, or (iii) conflict with or violate any agreement, permit, concession, grant, franchise, license, or other governmental authorization or approval necessary for purchase of the Loans by Buyer.  No regulatory approvals or consents are required with respect to Buyer's consummation of the transactions contemplated by this Agreement.

(d)  Litigation.  No action, suit, proceeding, or governmental investigation or inquiry is currently pending, or to the knowledge of Buyer, threatened against Buyer which, if adversely

21

determined, would have a material adverse effect on the business, combined assets or financial condition of Buyer or on the Loans or would prevent the consummation of the transactions contemplated by this Agreement.

(e) Financial Condition. Buyer has previously furnished Seller with Buyer's most recent audited financial statements, together with the respective reports thereon of the Buyer's independent public accountants, and Buyer's most recent unaudited financial statements, each of which has been prepared in accordance with generally accepted accounting principles. Each of the balance sheets included in the financial statements set forth Buyer's financial condition as of the date thereof, and there have been no material adverse changes in Buyer's business or financial condition since that date.

(f) Accuracy of Statements. Neither this Agreement, nor any statement, report, or other document furnished or to be furnished pursuant to this Agreement, or in connection with the transaction contemplated hereby, contains any untrue statement of fact by Buyer or omits to state a fact necessary to make the statements of Buyer contained therein not misleading.

(g) Ability to Perform; Solvency. Buyer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement. Buyer is solvent and the purchase of the Mortgage Loans will not cause Buyer to become insolvent.

(h) No Consent Required. No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Buyer of or compliance by Buyer with this Agreement or the Loans, or the purchase of the Loans by Buyer or the consummation of the transactions contemplated by this Agreement, or if required, such approval has been obtained prior to each Settlement Date.

(i) No Commissions to Third Parties. Buyer has not dealt with any broker or agent or other Person who might be entitled to a fee, commission, or compensation in connection with this transaction other than the Seller.

## SECTION 5 PRE-SETTLEMENT COVENANTS

Seller covenants and agrees that:

Section 5.1 Continued Servicing. Seller shall continue servicing the Loans to be sold on each Settlement Date, until the related Service Transfer Date, unless otherwise agreed to in writing by the parties, on Seller's system in conformance with all of the requirements of the Loan Documents and applicable law and in accordance with Accepted Servicing Practices. Seller shall send out at its expense the notice required to be provided to Obligors for any Interest Rate Adjustment scheduled to occur up to 10 days after the Service Transfer Date.

Section 5.2 Preparation of Assignments. Prior to each Settlement Date, Seller shall, at its sole expense, prepare and deliver an Assignment of Mortgage in form and substance acceptable to

22

Buyer and its counsel and any other security documents corresponding to each Loan to be sold on such Settlement Date. Assuming proper recordation, each such assignment shall be sufficient to perfect the transfer of Seller's security interest in the corresponding Mortgaged Property.

Section 5.3  IRS Reporting. To the extent required by law, Seller shall report to the IRS and each Obligor the amount of interest paid (including without limitation, the obligations with respect to Forms 1098 and 1099 and back up withholding with respect to same, if required) by such Obligor on the Loan on which he is the Obligor from the date of the advance made by Seller to such Obligor through and including the Service Transfer Date, and Buyer shall thereafter report to the IRS and each Obligor the amount of interest paid by such Obligor on the Loan on which he is the Obligor.

Section 5.4  Compliance with Law. From the date of this Agreement to each Settlement Date, Seller shall comply with all applicable state and Federal rules and regulations including those requiring the giving of notices, and where applicable, Seller warrants that it will comply with the National Housing Act of 1934, as from time to time amended, the Servicemen's Readjustment Act of 1944, as amended, and with all rules and regulations issued under said either such act.

Section 5.5  No Sale of Assets. Without the prior written consent of Buyer, Seller shall not sell, lease, assign, transfer, encumber or permit the encumbrance of, or otherwise dispose of:

(a) any of the Offered Loans from the date of the Offer until the earlier of (i) the day on which Seller receives Buyer's Response or (ii) the close of business on the day after which the Due Diligence Period expires; and

(b) any of the Loans included in the Loan Schedule to Buyer's Response from the date on which such Response is received until the Settlement Date.

Section 5.6  Private Mortgage Insurance. Seller shall provide any notification to private mortgage insurance companies necessary to ensure continuation of such insurance upon transfer of the Loans to Buyer.

## SECTION 6  POST-SETTLEMENT COVENANTS

Section 6.1  Notice of Servicing Transfer. Seller and Buyer shall each comply with, and Seller shall assist Buyer in complying with, the notice requirements for the transfer of servicing rights as set forth in RESPA and Regulation X. Such compliance by each party shall include, without limitation, sending its own notices of the transfer of servicing from Seller to Buyer, at its sole expense. For each Loan, Seller shall deposit such notice in the United States mail within five (5) business days after the Settlement Date on which such Loan is sold. Seller's notice to each Obligor shall state that any payments due from such Obligor that are due 15 or more days after the date on which Seller sends such notice shall be made to Buyer. Seller's assistance to Buyer shall include providing Buyer with any information that Seller has or has access to and that Buyer reasonably requires to complete its notices. Buyer shall approve any such notices sent by Seller, and Seller shall have the right to approve any such notices sent by Buyer, prior to the date mailed. To enable the parties to determine the Service Transfer Date, Seller shall, with respect to all Loans

23

sold on each Settlement Date, send all notices pursuant to this Section 6.1 on the same day, and shall, upon sending such notices, inform Buyer of the date on which such notices are sent. Within 10 days of each Settlement Date, Seller shall deliver to Buyer a copy of the notice sent with respect to each Loan sold on such Settlement Date.

Section 6.2    IRS Examination. Buyer and Seller shall cooperate fully with each other in connection with any examination conducted by any tax authority after each Settlement Date, provided that nothing herein shall be construed as obligating Buyer or Seller to disclose or furnish any tax information not related to the transfer of the Loans. Buyer and Seller shall inform each other promptly of any material developments in the course of any such examination, the results of any such examination, and any proceeding related thereto.

Section 6.3    Tax on Sale. Each party shall promptly pay in full and when due any tax or other governmental charge or fee imposed upon it under applicable law on the sale of the Loans from Seller to Buyer pursuant to this Agreement.

Section 6.4    Books and Records. Seller agrees to keep and maintain such books and records so as to meet and comply with all applicable laws, and the requirements or recommendations of ECOA and TILA. The same shall be available to Buyer at any time, upon reasonable notice, during business hours, for examination and audit to the extent required to determine compliance with such laws. Such records shall include a loan register documenting all loan applications taken by Seller.

Section 6.5    On Site Reviews. Seller agrees, upon reasonable notice and during regular ' business hours, to meet with Buyer from time to time to discuss Seller's business activities related to this Agreement and to allow Buyer to conduct periodic on-site audits of Seller's business activities related to this Agreement.

Section 6.6    Financial Statements. Seller shall furnish to Buyer for as long as this Agreement is in effect, (i) as soon as available, and in any event within 90 days after the end of each fiscal year of Seller, audited or certified financial statements of Seller consisting of a balance sheet as of the end of such fiscal year, together with related statements of income or loss and reinvested earnings and changes in financial position for such fiscal year, prepared by independent certified public accountants in accordance with generally accepted accounting principles, and (ii) if available, within 45 days after the end of each quarterly period unaudited financial statements which may be satisfied by furnishing a copy of the quarterly report filed with the Securities and Exchange Commission. However, in the event at any time Seller's net worth is less than $500,000, the obligation to deliver unaudited quarterly financial statements as described above shall be mandatory and in the event at any time Seller's net worth is less than $250,000, Seller shall be obligated to furnish to Buyer unaudited financial statements within fifteen (15) days of the end of each calendar month. Seller shall also provide Buyer, from time to time, upon reasonable request (which shall include a written statement describing the reason therefor) and 60 days' notice, any other financial reports or statements reasonably required by Buyer.

All such financial statements shall be delivered to:

Household Financial Services, Inc.
2700 Sanders Road
Prospect Heights, IL 60070
Attention: Vice President Business
          Relationship Risk Management

Section 6.7  Post-Sale Loan Payments.  Seller agrees that it will remit to Buyer, within 48 hours after receipt, any payment on a Loan including, without limitation, all payments of principal and interest, late charges, and bad check charges received from an Obligor on or after the Settlement Date at the following address: P.O. Box 2371, Brandon, FL 33509-2371, Attn: Cash Operations, or such other address as Buyer may designate.  Seller shall remit such payment via an overnight delivery service.

Section 6.8  Transfer of Servicing Rights and PMI.  Seller shall use all efforts to assist Buyer in the transfer from Seller to Buyer of servicing rights for each Loan, including assisting Buyer with any notices to private mortgage insurance companies.  Such efforts will include assisting in the conversion and transfer of data from Seller's servicing systems to Buyer's system by providing conversion tapes and other necessary materials to effect such conversion and transfer.  Seller shall also furnish loan master lists, systems data and other information reasonably requested by Buyer to conduct a pre-conversion performance test.

Section 6.9  Delivery of Mortgage Loan Documents.  With respect to each Loan, the Seller shall cause by no later than seven (7) days after receipt of the original recorded Mortgage and, if applicable, the prior Assignment of Mortgage and title insurance policy to be delivered to Buyer if they have not yet been returned from the applicable recording office or title insurer.  Seller shall make its best reasonable efforts to obtain such documents on a timely basis, such efforts to include follow-up with the applicable recording office, title insurer or other Person holding such documents at least quarterly. The Seller shall pay the out-of-pocket costs incurred in connection with such acts.

## SECTION 7  CONDITIONS TO SETTLEMENT

Section 7.1  Conditions to Buyer's Obligations.  The obligations of Buyer to purchase the Loans at each Settlement are subject to the satisfaction at or prior to such Settlement, of each of the following conditions (any or all of which may be waived by Buyer):

(a)  Representations and Warranties Correct.  Each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects in accordance with their terms as of the date of this Agreement, and on and as of such Settlement Date with the same force and effect as though made on and as of such Settlement Date, and Seller shall have delivered to Buyer a certificate to such effect signed on Seller's behalf by its President or another appropriate officer.

(b) Compliance with Covenants. Seller shall have performed and be in compliance with, in all material respects, all of its respective covenants, acts, and obligations to be performed under this Agreement and Seller shall have delivered to Buyer a certificate to such effect signed on Seller's behalf by its President or another appropriate officer.

(c) Settlement Documents. Seller shall have executed and delivered this Agreement and the Limited Powers of Attorney attached as Exhibit C, and the Agreement shall not have been terminated and the Limited Powers of Attorney shall not have been revoked. Seller shall have delivered the Mortgage Files and in connection with the Loans to be purchased on such Settlement Date, and executed all documents required to transfer the Loans in accordance with the terms of this Agreement.

(d) Corporate Documents. On or before the Settlement Date, if Buyer so requests, Seller shall have delivered to Buyer:

(i) a certificate of its jurisdiction of incorporation dated not earlier than the date of the tenth day preceding the Settlement Date, to the effect that Seller is a corporation validly existing and in good standing (if applicable) under the laws of such jurisdiction as of such date;

(ii) a certificate of the Secretary or Assistant Secretary of Seller attaching (A) evidence of such corporate action or authorization as is necessary to approve of this Agreement and the authorization of the officers of Seller to sign this Agreement, which action or authorization shall continue to be in force as of the Settlement Date, and (B) specimen signatures of the officers of Seller authorized to sign this Agreement;

(iii) a copy, certified as true by the Secretary or Assistant Secretary of Seller, of the charter and the by-laws of Seller; and

(iv) all other documents, instruments, and writing required to be delivered by Seller pursuant to this Agreement.

(e) Corporate Actions. All corporate and other acts necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereunder shall have been taken by Seller.

(f) Access to Information; Due Diligence. Buyer and its representatives shall have had access to such information and records of Seller as Buyer shall have reasonably requested to ascertain Seller's compliance with the Agreement, and all such information and records shall be satisfactory to Buyer and its representatives in accordance with the terms of this Agreement.

(g) No Pending Litigation. There shall not be pending or threatened any suit, action, injunction, investigation, inquiry, or other proceeding against either of the parties before any court or government agency, which, in Buyer's good faith judgment, has resulted or is reasonably likely

to result in an order staying or judgment restraining or prohibiting the transactions contemplated hereby or subjecting a party to material liability on the grounds that it has breached any law or regulation or otherwise acted improperly in connection with the transactions contemplated hereby.

Section 7.2  Opinion of Counsel.  If requested by Buyer, the obligations of Buyer to purchase the Loans at the first Settlement following execution of this Agreement are subject to Buyer having received an opinion of Seller's legal counsel in form and substance satisfactory to Buyer, as to such matters concerning this Agreement or the Settlement as are reasonably requested by Buyer. Thereafter, at each Settlement, if so requested by Buyer, Seller's counsel may furnish a reliance letter relating to the original opinion or may provide a new opinion.

Section 7.3  Conditions to Seller's Obligations.  The obligations of Seller to sell the Loans at each Settlement are subject to the satisfaction at or prior to such Settlement, of each of the following conditions (any or all of which may be waived by Seller):

(a)  Purchase Price.  The Purchase Price shall have been delivered to Seller pursuant to Seller's reasonable instructions in accordance with Section 3.3.

(b)  Representations and Warranties Correct.  Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects in accordance with their terms as of the date of this Agreement, and on and as of such Settlement Date with the same force and effect as though made on and as of such Settlement Date, and if Seller so requests, Buyer shall have delivered to Seller a certificate to such effect signed on Buyer's behalf by its President or another appropriate officer.

(c)  Compliance with Covenants.  Buyer shall have performed and be in compliance with, in all material respects, all of its respective covenants, acts, and obligations to be performed under this Agreement, and if Seller so requests, Buyer shall have delivered to Seller a certificate to such effect signed on Buyer's behalf by its President or another appropriate officer.

(d)  Corporate Documents.  On or before the Settlement Date, if Seller so requests, Buyer shall have delivered to Seller:

(i)  a certificate of its jurisdiction of incorporation dated not earlier than the date of the tenth day preceding the Settlement Date, to the effect that Buyer is a corporation validly existing and in good standing (if applicable) under the laws of such jurisdiction as of such date;

(ii)  a certificate of the Secretary or Assistant Secretary of Seller attaching (A) evidence of such corporate action or authorization as is necessary to approve this Agreement and the authorization of the officers of Buyer to sign this Agreement, which action or authorization shall continue to be in force as of the Settlement Date, and (B) specimen signatures of the officers of Buyer authorized to sign this Agreement,

27

(iii)  a copy, certified as true by the Secretary or Assistant Secretary of Buyer, of the charter and the by-laws of Buyer; and

(iv)  all other documents, instruments and writings required to be delivered by Buyer pursuant to this Agreement.

(e)  Corporate Actions.  All corporate and other acts necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereunder shall have been taken by Buyer.

(f)  No Pending Litigation.  There shall not be pending or, to the best of Buyer's knowledge upon reasonable due inquiry and investigation, threatened any suit, action, injunction, investigation, inquiry, or other proceeding against either of the parties before any court or government agency, which, in Seller's good faith judgment, has resulted or is reasonably likely to result in an order staying or judgment restraining or prohibiting the transactions contemplated hereby or subjecting a party to material liability on the grounds that it has breached any law or regulation or otherwise acted improperly in connection with the transactions contemplated hereby.

## SECTION 8  SURVIVAL OF COVENANTS, REPRESENTATIONS AND WARRANTIES; REPURCHASE OBLIGATION OF SELLER

It is understood and agreed that the covenants, representations and warranties set forth in this Agreement shall survive (i) any investigation made by or on behalf of Buyer, its assignee or designee, (ii) liquidation of the applicable Loan, (iii) termination of this Agreement, and (iv) transfer and delivery of the Offered Loan Documents to Buyer. All such covenants, representations and warranties shall terminate ten (10) years from the date on which such covenant, representation, or warranty is made.  It is further understood that the covenants, representations and warranties set forth in this Agreement shall inure to the benefit of Buyer, its Affiliates that receive assignment of Loans, or any holder of an endorsement of a Note.

## SECTION 9  POST-SETTLEMENT REPURCHASE AND ADJUSTMENTS

Section 9.1  Repurchase Obligations.

In the event that

(a)  Seller has failed to deliver to Buyer any document required hereunder with respect to any Loan sold on a Settlement Date within the applicable time period for delivery therefor and such failure has materially and adversely affected Buyer's ability to service or obtain payment on such Loan,

(b)  with respect to any Loan, there has been a breach of any of Seller's warranties, representations, covenants or agreements contained in this Agreement, other than those described in Section 9.1(a) or,

28

(c) Seller, its Affiliates, any other entity involved in originating or closing of a Loan, or any of their representatives, has acted fraudulently, negligently, or with willful misconduct in the origination or closing of a Loan,

Buyer shall give Seller notice of such failure, breach, or action. If Seller fails to cure such failure, breach or action within 30 days of Seller's receipt of such notice, Seller shall immediately repurchase such Loan at the Repurchase Price set forth in Section 9.2, provided; however, that with respect to a breach of the representation contained in Section 4.3 (c), Seller's repurchase obligation will be immediate upon receipt of notice of the breach. With respect to 9.1(a), failure to deliver the documents in the time frame required by Section 6.9 shall be deemed to materially and adversely affect Buyer's ability to service or obtain payment on a Loan. Any delay by Buyer in providing notice to Seller shall not constitute a waiver of any of Buyer's rights or remedies hereunder.

Section 9.2  Repurchase Price.  In the event Seller repurchases a Loan from Buyer pursuant to Section 9.1 above, the Repurchase Price shall be an amount equal to

(a) the product of

(i) the Bid Percentage and

(ii) the Principal Balance of such Loan,

(b) minus the aggregate amount of principal paid to Buyer on such Loan from the Settlement Date up to, but not including, the date of repurchase,

(c) plus accrued but unpaid interest up to and including the date of repurchase,

(d) plus any reasonable and customary out-of-pocket expenses paid to third parties relating to such Loan (the "Repurchase Price").

Upon payment of the Repurchase Price as set forth herein, Buyer shall deliver the Loan Documents relating to such repurchased Loan and shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as shall be necessary to vest in Seller title to such repurchased Loan on a servicing released basis. Seller shall pay all out-of-pocket costs incurred in delivering the Mortgage File to the Seller. Except for the negligence or willful misconduct of Buyer or Buyer's representative, the Buyer shall have no liability for the failure by the courier to deliver the Mortgage File to the Seller for any reason whatsoever.

Section 9.3  Remedy to Insure Accuracy of Real Estate Appraisals.  Buyer may, at its own expense, in order to verify the accuracy of real property appraisals prepared for Seller, order a reappraisal of the property secured by a Mortgage within 100 days of the applicable Settlement Date. If the reappraisal obtained by Buyer indicates a fair market value of more than twelve (12%) percent less than the original Appraisal Value, then upon receipt by Seller of a signed copy of the reappraisal from Buyer, Seller shall repurchase the Loan at the Repurchase Price and reimburse Buyer for the cost of the appraisal subject to the following:  if Seller disputes the validity of the

reappraisal prepared by Buyer's appraiser, Seller may at its own expense, request Buyer to obtain a third appraisal, and only if such third appraisal is also more than twelve (12%) percent less than the original Appraisal Value shall the Seller be required to repurchase the Loan at the Repurchase Price and pay for the second appraisal. Buyer shall choose the review appraiser with Seller's approval, which shall not be unreasonably withheld, but such appraiser must possess the minimum qualifications specified in the HFS Seller's Guide. The appraisal must be performed in accordance with the standards of the appraising industry where the property is located, by an independent appraiser unless otherwise agreed to by the parties. In determining the appropriate appraisal value, the review appraiser must determine the appraised value as of the original appraisal date using comparable sales that were available as of the date of the original appraisal.

Section 9.4 Post-Settlement Adjustments to Purchase Price. Within 60 days after each Settlement Date, the first party shall notify the other party in writing of any miscalculations, misapplied payments, unapplied payments or other accounting errors (each, a "Discrepancy") which the first party has discovered and which affects the Principal Balance of any of the Loans purchased on such Settlement Date or the Purchase Price for the Loans purchased on such Settlement Date. Notice to the other party under this Section 9.4 shall include copies of documents sufficient to describe each Discrepancy. Buyer shall pay Seller or Seller shall pay Buyer, as the case may be, an amount sufficient to correct such Discrepancy, with all such adjustments calculated using the Premium. Any amounts due hereunder shall be paid within 10 days of notice by the first party to the other party.

## SECTION 10 INDEMNIFICATION

Section 10.1 Seller's Indemnification.

(a) Seller agrees to indemnify and hold harmless Buyer, its Affiliates, officers, directors, employees, agents, successors, and assigns, and related entities from and to reimburse them for, any loss, cost, expense, damage, liability, or claim (including, without limitation, all Legal Fees) relating to, arising out of, based upon, or resulting from:

(i) Seller's ownership of or actions with respect to the Loans;

(ii) Breach of any of Seller's representations and warranties contained in this Agreement; or

(iii) Breach of, or failure to perform, any of Seller's covenants or agreements contained in or made pursuant to this Agreement.

(b) The obligations of Seller under this Section shall survive (i) the transfer and delivery of the Loans to Buyer, (ii) any investigation made by or on behalf of Buyer, its assignee or designee, (iii) liquidation of the applicable Loan, and (iv) termination of this Agreement.

30

(c) Notwithstanding the foregoing, Seller shall not have any liability in respect of the representations or warranties on the part of Seller herein contained to the extent such liability would not have arisen but for Buyer's own willful misconduct or negligence.

Section 10.2 Buyer's Indemnification.

(a) HFS agrees to indemnify and hold harmless Seller, its Affiliates, officers, directors, employees, agents, successors, and assigns, and related entities from, and to reimburse them for, any loss, cost, expense, damage, liability, or claim (including without limitation, all Legal Fees) relating to, arising out of, based upon, or resulting from:

(i) Buyer's ownership of or actions with respect to the Loans;

(ii) Buyer's breach of any of its representations and warranties contained in this Agreement; or

(iii) Buyer's breach of or failure to perform any of its covenants or agreements contained in or made pursuant to this Agreement.

(b) The obligations of HFS under this Section shall survive (i) the transfer and delivery of the Loans to Buyer, (ii) any investigation made by or on behalf of Seller, its assignee or designee, (iii) liquidation of the applicable Loan, and (iv) termination of this Agreement.

(c) Notwithstanding the foregoing, Buyer shall not have any liability in respect of the representations or warranties on the part of Buyer herein contained to the extent such liability would not have arisen but for Seller's own willful misconduct or negligence.

Section 10.3 Indemnification Procedures.

(a) Within 10 days after receipt by a party of any claim or the commencement of any action, the indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under this Agreement, deliver a claim notice to the indemnifying party; provided, however, that the omission to so notify the indemnifying party shall not relieve the indemnifying party from any liability that the indemnifying party may have to the indemnified party otherwise than under this subsection unless such delay has materially prejudiced the indemnifying party. In the event that such claim is made or action brought against the indemnified party and the indemnified party notifies the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, to assume the defense thereof with counsel reasonably satisfactory to the indemnified party. The indemnifying party shall give prompt notice to the indemnified party of whether it intends to participate and/or assume the indemnified party's defense.

The indemnified party may also employ separate counsel in any action or claim and to participate in the defense thereof but the fees and expenses of such counsel shall be at the expense of such indemnified party unless: (i) the employment thereof has been specifically authorized by

the indemnifying party in writing; (ii) such indemnified party shall have been advised by such counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the indemnifying party and in the reasonable judgment of such counsel it is advisable for such indemnified party to employ separate counsel; or (iii) the indemnifying party has failed to assume the defense of such action and employ counsel reasonably satisfactory to the indemnified party. If such indemnified party notifies the indemnifying party in writing that it elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such action on behalf of such indemnified party, it being understood, however, the indemnifying party shall not, in connection with any one such action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one separate firm of attorneys (in addition to local counsel) at any time for all such indemnified parties, which firm shall be designated in writing by the indemnified party.

(b)    The indemnifying party shall remit payment for the amount of a valid and substantiated claim for indemnification hereunder within 15 business days of the receipt of a claim notice therefor. Upon the payment in full of any claim hereunder, the indemnifying party shall be subrogated to the rights of the indemnified party against any person with respect to the subject matter of such claim. In the event of a dispute, the parties shall proceed in good faith to negotiate a resolution of such dispute.

(c)    No indemnifying party shall be liable for any settlement of any such action effected without its written consent (which consent shall not be unreasonably withheld), but if settled with its written consent or if there be a final judgment for the plaintiff in any such action, the indemnifying party agrees to indemnify and hold harmless any indemnified party from and against any loss or liability by reason of such settlement or judgment. No indemnifying party shall, without prior written consent of the indemnified party, effect any settlement of any pending or threatened action in respect of which such indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party unless such settlement includes an unconditional release of such indemnified party from all liability on any claims that are the subject matter of such action. The indemnified party shall have the right to reject any settlement approved by the indemnifying party if the indemnified party waives its right to indemnification hereunder. The indemnified party shall have the right to settle any third party claim over the objection of the indemnifying party; provided, however, that if the indemnifying party is contesting such claim in good faith and has assumed the defense of such claim from the indemnified party, the indemnified party waives any right to indemnity therefor.

(d)    In the event that the indemnifying party reimburses the indemnified party with respect to any third party claim and the indemnified party subsequently receives reimbursement from another person with respect to that third party claim, then the indemnified party shall remit such reimbursement from such other person to the indemnifying party within 30 days of receipt thereof.

## SECTION 11  TERMINATION

Section 11.1  <u>Termination by Either Party.</u>

(a)  This Agreement may be terminated with or without cause by either party upon 30 days' written notice to the other party, provided that the delivery requirements and other terms of this Agreement have been fully complied with as to prior Settlements.

(b)  After termination pursuant to Section 11.1(a), the provisions of this Agreement shall continue to apply to any Loans previously transferred from Seller to Buyer pursuant to this Agreement.

Section 11.2  <u>Termination by Buyer.</u>  This Agreement may be immediately terminated by Buyer, at Buyer's sole option, upon notice to Seller upon the occurrence of any of the following events ("Termination Events"):

(a)  Seller breaches or fails to comply with any term or condition of this Agreement and fails to cure such breach or failure within 60 days of receipt of notice thereof from Buyer;

(b)  Any of Seller's representations or warranties in Section 4.1, 4.2, or 4.3 of this Agreement is untrue in any material respect and is not cured by Seller within 60 days of receipt of notice thereof from Buyer;

(c)  Notwithstanding Section 11.2(a), Seller does not deliver the Loans or any Loan Document relating to such Loans within the time periods stated in this Agreement;

(d)  Notwithstanding Sections 11.2(a) and 11.2(b), any document or paper delivered hereunder is incorrect in any material respect or otherwise does not comply with the terms and provisions of this Agreement;

(e)  Any material reduction in Seller's net worth occurs, as determined solely by Buyer;

(f)  A petition for involuntary bankruptcy is filed against Seller, or Seller is adjudged bankrupt or insolvent by a court of competent jurisdiction or a regulatory agency, or a court of competent jurisdiction or a regulatory agency appoints a receiver, liquidator, conservator, or trustee for Seller or all or substantially all of its assets, or approves any petition filed against Seller for its reorganization;

(g)  Seller institutes proceedings for voluntary bankruptcy, files a petition seeking reorganization under the Federal Bankruptcy Code, files under any law for the relief of debtors, consents to the appointment of a receiver of all or substantially all of its property, makes a general assignment for the benefit of its creditors, or admits in writing its inability to pay its debts generally as they become due;

(h) Seller merges with or consolidates into another corporation, sells or otherwise disposes of all or substantially all of its property and assets, or permits any change to occur in the stock ownership of Seller which would transfer effective voting control from the persons now exercising such control to others; and

(i) The placement of Seller on probation or restriction of its activities in any manner by a Federal or state government agency, including Freddie Mac, Fannie Mae, or GNMA.

Section 11.3  Effect of Termination.  Upon expiration of the 30 day notice period pursuant to Section 11.1(a) or upon written notice to Seller, pursuant to Section 11.2 that a Termination Event has occurred, this Agreement shall be of no force and effect and the parties obligations to each other hereunder shall cease; provided, however, that each party shall continue to have such obligations as may remain with respect to all Loans acquired by Buyer in Settlements that have occurred prior to the date on which this Agreement terminates.

## SECTION 12  MISCELLANEOUS

Section 12.1  No Waiver.  Failure or delay on the part of Buyer to audit any Loan or to exercise any right provided for herein, shall not act as a waiver thereof, nor shall any single or partial exercise of any right by Buyer or Seller preclude any other or further exercise thereof.  In no event shall a term or provision of this Agreement be deemed to have been waived, modified or amended, unless said waiver, modification or amendment is in writing and signed by the parties hereto.  Notwithstanding any investigation conducted before or after the purchase of any Loan, and notwithstanding any actual or implied knowledge or notice of any facts or circumstances which Buyer may have as a result of such investigation or otherwise, Buyer shall be entitled to rely upon the warranties, representations, and covenants of Seller in this Agreement, and the obligations of Seller with respect thereto shall survive the purchase of said Loans by Buyer and inure to the benefit of Buyer's Affiliates and all assignees of said Loans.

Section 12.2  Amendment and Modification.  Subject to applicable law, this Agreement may not be amended, modified, or supplemented except in writing signed by both parties. Notwithstanding the foregoing, Seller may unilaterally amend the underwriting standards set forth in Section 4.2 (b) upon the thirty (30) days written notice to Buyer.

Section 12.3  Notices.  All notices, requests, demands, consents, approvals, agreements, or other communications to or by a party to this Agreement shall:

(a) be in writing addressed to the authorized address of the recipient set out in Section 12.3(c) of this Agreement or to such other address as such recipient may have notified the sender;

(b) be signed by an authorized officer of the sender; and

(c)   be delivered in person or sent by registered or certified mail return receipt requested, facsimile transmission, or by overnight courier and be deemed to be duly given or made:

(i)   in the case of delivery in person when delivered to the recipient at such address;

(ii)   in the case of registered or certified mail three days after the date of mailing;

(iii)   in the case of overnight courier two days after shipment or the date of receipt, whichever is earlier; or

(iv)   in the case of facsimile transmission when received in legible form by the recipient at such address and in the event that the recipient has been requested to acknowledge receipt of the entire facsimile transmission upon the sending or receiving the acknowledgment of receipt (which acknowledgment the recipient will promptly give);

but if such delivery or dispatch is later than 5:00 p.m. local time on a day on which business is generally carried on in the place to which such communication is sent or occurs on a day on which business is not generally carried on in the place to which such communication is sent, it will be deemed to have been duly given or made at the commencement of business on the next day on which business is generally carried on in that place.

Notices may be sent

| | |
|---|---|
| to Buyer: | Household Financial Services, Inc.<br>2700 Sanders Road<br>Prospect Heights, IL 60070<br>Attn: Vice President Business Relationship<br>       Risk Management<br>Facsimile No.: (847) 205-7506 |
| with a copy to: | Household Financial Services, Inc.<br>2700 Sanders Road<br>Prospect Heights, IL 60070<br>Attn: General Counsel<br>Facsimile No.: (847) 564-6001 |
| To Seller: | American Freedom Mortgage, Inc.<br>1100 Circle 75, Suite 980<br>Atlanta, GA 30339 |
| with a copy to: | General Counsel<br>at the above address |

or to such other address as Buyer and Seller shall have specified in writing to each other.

Section 12.4 Expenses. Each party hereto shall bear its own expenses, including the fees of any attorneys, accountants, or others engaged by such party, in connection with this Agreement and the transactions contemplated hereby, except as otherwise expressly provided herein.

Section 12.5 No Remedy Exclusive. No remedy under this Agreement is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies under this Agreement or existing at law or in equity.

Section 12.6 Independent Contractor. Nothing herein contained shall be deemed or construed to create a partnership or joint venture between Seller and Buyer. In the performance of its duties or obligations under this Agreement or any other contract, commitment, undertaking, or agreement made pursuant to this Agreement, neither Seller nor Buyer shall be deemed to be, or permit itself to be, understood to be the employee or agent of the other and shall at all times take whatever measures as are necessary to insure that its status shall be that of an independent contractor operating as a separate entity. None of Seller's or Buyer's employees, agents or servants is entitled to the benefits that are provided to the employees of the other party. Each party is solely interested in the results obtained under this contract and therefore the manner and means of conducting the other party's business affairs are under the sole control of such other party and such other party shall be solely and entirely responsible for its acts and for the acts of its agents, employees, and servants.

Section 12.7 Severability. If any one or more of the provisions of this Agreement shall be held to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions of this Agreement shall not be affected thereby. To the extent permitted by applicable law, each party hereto waives any provision of law which renders any provision of this Agreement invalid, illegal, or unenforceable in any respect, unless material to the purpose of this Agreement.

Section 12.8 Entire Agreement. Seller and Buyer each acknowledges that no representations, agreements, or promises were made to such party by the other party or any of its employees other than those representations, agreements, or promises specifically contained herein. This Agreement and any Schedules and Exhibits hereto constitute the entire agreement and understanding of the parties with respect to the matters and transactions contemplated hereby. This Agreement supersedes any prior agreement and understanding with respect to these matters and transactions.

Section 12.9 Assignment. Except as set forth in the following sentence, neither party shall have the right to assign any of its duties, obligations, or rights under this Agreement without the prior written consent of the other. Buyer shall have the right to assign its rights under this Agreement to any Affiliate or to any trust created to effect a securitization involving the Loans, and in such event no such assignment shall relieve either party of any liability under this Agreement.

Section 12.10  Captions.  The captions in this Agreement are for convenience only, do not form a part hereof, and do not in any way modify, interpret, or construe the intentions of the parties hereto.

Section 12.11  Governing Law.  This Agreement shall be governed by and be construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws rules thereof.

Section 12.12  Counterparts.  This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 12.13  Drafting.  Each party acknowledges that its legal counsel participated in the preparation of this Agreement.  The Parties therefore stipulate that the rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement to favor any party against the other.

Section 12.14  Choice of Forum.  Any judicial proceeding brought against any of the parties hereto with respect to this Agreement shall be brought in any court of competent jurisdiction in Cook County, Illinois or in the Federal District Court for the Northern District of the State of Illinois irrespective of where such party may be located at the time of such proceeding, and by execution and delivery of this Agreement, each of the parties to this Agreement hereby consents to the exclusive jurisdiction of any such court and waives any defense or opposition to such jurisdiction.

**Section 12.15  WAIVER OF JURY TRIAL.  EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

IN WITNESS WHEREOF, Buyer and Seller have caused their respective duly authorized representatives to execute this Agreement as of the date first above written.

BUYER:

HOUSEHOLD FINANCIAL SERVICES, INC.

By: _____

Name:        Loren J. Morris

Title:        Vice President

SELLER:

AMERICAN FREEDOM MORTGAGE, INC.

By: _____

Name: Tamara L. Burch

Title: President

j:\hfslaw/BulkAgmt\Masterbulk8
eff 2/14/02

38

**EXHIBIT A**

CONTENTS OF LEGAL FILE

With respect to each Loan, the Legal File shall include each of the following items, which shall be delivered to the Buyer.

1.    The original Note, bearing all intervening endorsements, endorsed, "Pay to the order of _____, without recourse" and signed in the name of Seller by an authorized officer or by facsimile signature.

2.    Either: (i) the original recorded Mortgage with recording information thereon, together with a certified true copy of the original power-of-attorney showing the recording information thereon if the Mortgage was executed by an attorney-in-fact, (ii) a certified true copy of the Mortgage and of the power-of-attorney (if applicable) the originals of which have been transmitted for recording, until such time as the originals are returned by the public recording office in which case the Seller shall deliver the original recorded Mortgage within 5 business days of receipt from the County Records Office; or (iii) a copy of the Mortgage certified by the public recording office in those instances where the public recording office retains the original or the original is lost, together with a duplicate original mortgagee's certificate of title if the Mortgage is registered under the Torrens system.

3.    The original Assignment of Mortgage for each Loan, in blank, in form and substance acceptable to Buyer and its counsel, and for recording but not recorded, signed in the name of Seller by an authorized officer; provided, however, that certain recording information will not be available if, as of the Settlement Date, Seller has not received the related recorded Mortgage from the recorder's office.

4.    A copy of the title search and mortgage title insurance commitment or the original mortgage title insurance policy issued by an approved ALTA title insurance company on such form and subject to such exceptions as are approved by Buyer and Buyer's counsel; provided, however, that if the original is not available as of the date the Mortgage is delivered to Buyer, Seller shall deliver the original to Buyer within sixty (60) days after the Settlement Date, or if it has not been received by that date, within 5 business days after receipt from the title company. Seller shall make all due efforts to obtain and deliver such title policy within the above time period.

E-1

5.  Originals of all intervening assignments, if any, with evidence of recording thereon, or certified true copies with evidence that the originals have been transmitted for recording until such time as the originals are returned by the public recording office, or a copy of each such assignment certified by the public recording office if such office retains the original, or if such original is lost.

6.  Originals of all assumption, modification, consolidation or extension agreements with evidence of recording thereon, if any.

7.  Original guarantee, if any.

8.  The original of any security agreement, chattel mortgage or equivalent, executed in connection with the Mortgage, if any.

## EXHIBIT B

### CONTENTS OF CREDIT FILE

With respect to each Loan, the Credit File shall include each of the following items.

1.  A copy of the original Note, bearing all intervening endorsements, endorsed, "Pay to the order of _____, without recourse" and signed in the name of Seller by an authorized officer or by facsimile signature.

2.  A copy of either: (i) the original recorded Mortgage with recording information thereon, together with a certified true copy of the original power-of-attorney showing the recording information thereon if the Mortgage was executed by an attorney-in-fact; (ii) a certified true copy of the Mortgage and of the power-of-attorney (if applicable) the originals of which has been transmitted for recording, until such time as the originals are returned by the public recording office; or (iii) a copy of the Mortgage certified by the public recording office in those instances where the public recording office retains the original or the original is lost, together with a duplicate original mortgagee's certificate of title if the Mortgage is registered under the Torrens system.

3.  A copy of the original Assignment of Mortgage for each Loan, in blank, in form and substance acceptable to Buyer and its counsel, and for recording but not recorded; provided, however, that certain recording information will not be available if, as of the Settlement Date, Seller has not received the related recorded Mortgage from the recorder's office.

4.  A copy of the original policy of title insurance (or, if such policy has not yet been issued by the insurer, the preliminary title report).

5.  A copy of all intervening assignments, if any, with evidence of recording thereon, or certified true copies with evidence that the originals have been transmitted for recording until such time as the originals are returned by the public recording office, or a copy of each such assignment certified by the public recording office if such office retains the original, or if such original is lost.

6.  A copy of all assumption and modification agreements, if any.

7.  A survey or plat of the Mortgaged Property (except if the Mortgaged Property is a condominium unit), unless the title insurance contains a 116 or "no survey" endorsement.

8.  Original hazard insurance policy (or certificate of insurance for a condominium or planned unit development unit) and certificate or original policy of flood insurance, if applicable. (In lieu of an insurance policy for each Loan, Seller may carry a Mortgage Impairment Policy meeting the requirements of Fannie Mae or Freddie Mac).

9.    Loan closing statement or a copy thereof.

10.    Residential loan application.

11.    Verification of employment and income (if applicable).

12.    Verification of evidence of source and amount of down payment (if applicable).

13.    Credit report on the Obligor.

14.    Residential appraisal report.

15.    Photograph of the property.

16.    (a)    Payment records and current and historical computerized data files; and

       (b)    tax receipts, insurance premium receipts, ledger sheets, insurance claim files and correspondence, correspondence, and all other papers and records developed or originated by Seller or others, required to document the Loan or to service the Loan provided, however, that these items may be provided no later than 15 days after the Service Transfer Date.

17.    A copy of the guarantee, if any.

18.    Copies of any security agreement, chattel mortgage or equivalent, executed in connection with the Mortgage, if any.

19.    Copy of each instrument necessary to complete identification of any exception set forth in the title policy, if any.

20.    All required disclosure statements, including a copy of the HUD good faith estimate, HUD-1 settlement statement and TILA disclosure statement prepared in connection with the Loan indicating that the Obligor has received all disclosures required by the RESPA and TILA.

21.    Termite reports, structural engineer's report, water potability and septic certification, if any.

22.    Sales contract, if any.

23.    If the Mortgaged Property is a leasehold estate, a copy of the lease with evidence of recording thereon (or, if such recorded copy has not yet been returned to Seller by the applicable recording office, a copy thereof certified by Seller to be a true, correct and complete copy of such lease sent for recording).

E-4

24.   Any and all documents, agreements or instruments related to the Loan or the Note and Seller's right and benefits therein; all documents related to the making and closing of the Loan; and any other documents, agreements, or instruments related to the Loan or required by Buyer, in order to perfect its right, title and interest in and to the Loan or required by Buyer in order to enable Buyer to sell the Loan to a private investor or as part of a securitization or other financing vehicle.

25.   A statement showing the account number, customer name, unpaid principal balance of the Loan, the amount of periodic installments and the date(s) to which principal, interest and any escrows have been paid, the accrued but unpaid interest up to and including the Settlement Date provided, however, that this information may be provided in a trial balance; and, if required by Buyer, a ledger card or ledger history reflecting all receipts and disbursements from the inception of the Loan including the date of each receipt or disbursement, provided, however, that these items may be provided no later than 15 days after the Service Transfer Date.

**EXHIBIT C**

**Limited Power of Attorney**

Whereas *American Freedom Mortgage* ("Seller") has sold or intends to sell certain Loans to Household Financial Services, Inc., and its Affiliates (collectively, "Buyer") pursuant to that certain Bulk Continuing Loan Purchase Agreement dated *3/29/02* ("Agreement"). (Capitalized terms not otherwise defined herein shall have the meaning set forth in the Agreement.)

Now, therefore, Seller does hereby constitute and appoint Buyer the true and lawful attorney-in-fact of Seller and in Seller's name, place and stead for the following, and only the following purposes:

(i)     executing, acknowledging, and delivering to Buyer any assignment of Mortgage or other document necessary to transfer to, or vest in Buyer or to protect the right, title and interest of Buyer in and to those Loans provided, however, that any endorsement given or made pursuant hereto with respect to any Note other instrument evidencing a Mortgage Loan or an interest therein shall be so given or made without recourse and without any representation or warranty of any kind, except to the extent otherwise expressly provided in the Agreement.

(ii)    endorsing, as agent for Seller, any checks or other instruments (made payable to Seller) received as payment with respect to the Loans after each related purchase.

Seller intends that this Limited Power of Attorney ("POA") is coupled with an interest and not revocable.

Seller further grants to Buyer as its attorney-in-fact full authority to act in any manner both proper and necessary to exercise the foregoing powers, and ratifies every act that Buyer may lawfully perform in exercising those powers by virtue thereof.

Buyer shall indemnify, defend and hold harmless Seller, its successors and assigns, from and against any and all losses, costs, expenses, (including, without limitation, reasonable attorneys' fees), damages, liabilities, demands, or claims of any kind whatsoever ("Claims") arising out of (i) any act taken by Buyer pursuant to this POA, which act results in a Claim solely by virtue of the unlawful use of this POA (and not a result of a Claim related to the underlying instrument with respect to which the POA has been used), or (ii) any use or misuse of this POA in any manner or by any person or entity not expressly authorized hereby.

IN WITNESS WHEREOF, Seller has executed this Limited Power of Attorney this *29th* day of *March*, *2002*.

Seller: *American Freedom Mortgage, Inc.*

By: _____

Name: *Tamara L. Burch*

Title: *President*

STATE OF *Georgia*

COUNTY OF *Cobb*

On this, the *29th* day of *March*, *2002*, the foregoing instrument was acknowledged before me, a notary public, in and for the State of *Georgia* _____, by *Tamara L. Burch* _____, personally known to me, by me duly sworn, did say he/she is the *President* of *American Freedom Mortgage, Inc.*.

_____

Notary Public

My Commission Expires:

WILLIAM E. BUCKNER
NOTARY
EXPIRES
GEORGIA
JUNE 1, 2004
PUBLIC
COBB COUNTY

SEAL

## SCHEDULE 1

Information to be Included in Offered Loan Schedule

Attached.

SCHEDULE 1 continued

Preliminary Data Required to Price Pool

Loan Number
Documentation Type
Credit Grade
Loan Purpose
Name
State
Zip
Current Principal Balance
Original Term, including Balloon information
Origination Date
Prepayment
Rate-Fixed/Adjustable
Index
Gross Margin
Current Mortgage Interest Rate
Rate Adjustment Periods
Rate Adjustment Caps
Rate Floor
Rate Ceiling
1st Payment Due Date
Next Due
Debt Ratio
Lien Position
Senior Balances
LTV-Combined (CLTV)
Property Type
Occupancy

S-2

## SCHEDULE 2

<u>Seller's Underwriting Standards</u>

Attached.

**Limited Power of Attorney**

Whereas *American Freedom Mortgage* ("Seller") has sold or intends to sell certain Loans to Household Financial Services, Inc., and its Affiliates (collectively, "Buyer") pursuant to that certain Flow Loan Purchase Agreement dated *3/29/02* ("Agreement"). (Capitalized terms not otherwise defined herein shall have the meaning set forth in the Agreement.)

Now, therefore, Seller does hereby constitute and appoint Buyer the true and lawful attorney-in-fact of Seller and in Seller's name, place and stead for the following, and only the following purposes:

(i) executing, acknowledging, and delivering to Buyer any assignment of Mortgage or other document necessary to transfer to, or vest in Buyer or to protect the right, title and interest of Buyer in and to those Loans provided, however, that any endorsement given or made pursuant hereto with respect to any Note other instrument evidencing a Mortgage Loan or an interest therein shall be so given or made without recourse and without any representation or warranty of any kind, except to the extent otherwise expressly provided in the Agreement.

(ii) endorsing, as agent for Seller, any checks or other instruments (made payable to Seller) received as payment with respect to the Loans after each related purchase.

Seller intends that this Limited Power of Attorney ("POA") is coupled with an interest and not revocable.

Seller further grants to Buyer as its attorney-in-fact full authority to act in any manner both proper and necessary to exercise the foregoing powers, and ratifies every act that Buyer may lawfully perform in exercising those powers by virtue thereof.

Buyer shall indemnify, defend and hold harmless Seller, its successors and assigns, from and against any and all losses, costs, expenses, (including, without limitation, reasonable attorneys' fees), damages, liabilities, demands, or claims of any kind whatsoever ("Claims") arising out of (i) any act taken by Buyer pursuant to this POA, which act results in a Claim solely by virtue of the unlawful use of this POA (and not a result of a Claim related to the underlying instrument with respect to which the POA has been used), or (ii) any use or misuse of this POA in any manner or by any person or entity not expressly authorized hereby.

**IN WITNESS WHEREOF**, Seller has executed this Limited Power of Attorney this *5* day of *April*, *2002*.

Seller: *American Freedom Mortgage, Inc.*
By: *[signature]*
Name: *Tamara L. Burch*
Title: *President*

STATE OF *Georgia*
COUNTY OF *Cobb*

On this, the *5th* day of *April*, *2002*, the foregoing instrument was acknowledged before me, a notary public, in and for the State of *Georgia*, by _____ *Tamara L. Burch* personally known to me, by me duly sworn, did say he/she is the *President* of *American Freedom Mortgage, Inc.*

_____
Notary Public
My Commission Expires:

SEAL

WILLIAM E. BUCKNER
NOTARY
EXPIRES
GEORGIA
JUNE 1, 2004
PUBLIC
COBB COUNTY

# EXHIBIT B

# FLOW LOAN PURCHASE AGREEMENT

## BY AND BETWEEN

## HOUSEHOLD FINANCIAL SERVICES, INC.

## AND

## AMERICAN FREEDOM MORTGAGE, Inc.

DATED AS OF   3/29  , 2002

## TABLE OF CONTENTS

Page No.

Section 1    Mortgage Purchases..................................................................................
Section 2    Defined Terms....................................................................................... 1
Section 3    Procedural Matters................................................................................ 1
Section 4    Seller's Representations and Warranties ............................................... 2
Section 5    Survival of Covenants, Representations and Warranties. Repurchase ... 3
            Repurchase Obligations of Seller ......................................................
Section 6    Compliance with Insurance Requirements ........................................... 14
Section 7a   Purchase Price....................................................................................... 14
Section 7b   Premium Rebate .................................................................................... 14
Section 8    Delivery of Loan Documentation .......................................................... 14
Section 9    Eligibility of Mortgage Loans for Sale or Transer ............................... 15
Section 10   Repurchase of Mortgage Loans ............................................................ 17
Section 11   Repurchase Price................................................................................... 17
Section 12   Indemnification..................................................................................... 18
Section 13   Books and Records ............................................................................... 18
Section 14   Financial Information ............................................................................ 19
Section 15   Escrow Deposits and Servicing Rights.................................................. 19
Section 16   Restrictive Covenant ............................................................................ 19
Section 17   Termination and Default........................................................................ 19
Section 18   Notices.................................................................................................. 20
Section 19   No Waiver............................................................................................. 21
Section 20   No Remedy Exclusive .......................................................................... 21
Section 21   Independent Contractor ........................................................................ 22
Section 22   Buyers Acceptance ............................................................................... 22
Section 23   Entire Agreement.................................................................................. 22
Section 24   Assignment............................................................................................ 22
Section 25   Modification .......................................................................................... 22
Section 26   Governing Law...................................................................................... 22
Section 27   Counterparts ......................................................................................... 22
Section 28   Choice of Forum ................................................................................... 23
Section 29   Waiver of Jury Trial ............................................................................. 23
                                                                                            23

EXHIBITS

Exhibit A - Limited Power of Attorney

## FLOW LOAN PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into this _29_ day of _March_, 2002, by and between HOUSEHOLD FINANCIAL SERVICES, INC., a Delaware corporation ("HFS", and with its Affiliates, "Buyer"), and AMERICAN FREEDOM MORTGAGE, a GEORGIA corporation, with a principal office located at 1100 CIRCLE 75 PARKWAY, STE 780, ATLANTA, GA 30339 ("Seller").

WHEREAS, Seller is engaged in the business of making, originating or otherwise acquiring non-conforming Mortgage Loans on completed, one-to-four family residential properties; and

WHEREAS, Seller desires from time to time to sell to Buyer, and Buyer desires to purchase from Seller from time to time particular Mortgage Loans and all monies due and to become due thereunder.

NOW, THEREFORE, in consideration of the premises and other covenants contained herein Buyer and Seller agree as follows:

1. **MORTGAGE PURCHASES**. Seller from time to time may offer to sell and Buyer may agree to buy Mortgage Loans and the right to service those Loans pursuant to the provisions of this Agreement, the HFS Seller Guide (as defined below) and any confirmation letters, commitment letters or other correspondence (collectively referred to as "Letters") between Buyer and Seller. The sale and transfer of Mortgage Loans by Seller to Buyer shall be subject to the provisions of this Agreement, the HFS Seller Guide and the Letters. The HFS Seller Guide, as amended or supplemented from time to time, and the Letters, are incorporated by reference herein.

2. **DEFINITIONS**. Whenever used in this Agreement, the following words, unless otherwise expressly provided or unless the context otherwise requires, shall have the following meanings:

   A. "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the Person specified.

   B. "Credit Package" means the documents and verifications required to underwrite the loan application and lead to an approval or denial of the loan request.

   C. "ECOA" means the Equal Credit Opportunity Act (15 USC § 1691).

D.      "Fannie Mae" means Fannie Mae.

E.      "Freddie Mac" means Freddie Mac.

F.      "GNMA" means the Governmental National Mortgage Association.

G.      "HFS Ineligible List" means the list of Persons that are ineligible to do business with HFS, as such list is published by HFS from time to time.

H.      "HFS Seller Guide" means the Household Financial Services, Inc. Seller Guide and the Exhibits therein, as presently in effect or as may be amended or supplemented from time to time. The HFS Seller Guide describes, among other things Buyer's underwriting guidelines, appraisal guidelines, documentation requirements for purchased Loans and loan programs.

I.      "Mortgage," "Mortgage Loan," or "Loan" refer to whole loans or home equity lines of credit secured by a first or second lien on completed, one-to-four family residential real estate and purchased by Buyer from Seller subject to this Agreement, the HFS Seller Guide and the Letters. The terms include all documents required to be transferred from Seller to Buyer by the HFS Seller Guide and the Letters. The term "Mortgage" shall include trust deeds, security deeds and deeds of trust as well as mortgages and the terms "Mortgagor" and "Mortgagors" shall mean mortgagors, trustors of trust deeds and deeds of trust and the grantors of any security deeds.

J.      "Mortgage File" means all the documents, information and other items pertaining to a particular Mortgage Loan required by this Agreement, the HFS Seller Guide or any Letter for Mortgage Loans purchased by Buyer from Seller.

K.      "Note" means a valid and enforceable Note or evidence of indebtedness secured by a Mortgage.

L.      "Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability partnership, limited liability company, unincorporated organization or government or any agency or political subdivision thereof.

M.      "RESPA" means the Real Estate Settlement Procedures Act (12 USC § 2601).

N.      "TIL" means the Truth in Lending Act (15 USC § 1601).

3.      **PROCEDURAL MATTERS**. Buyer may waive Paragraphs A, B and C below, in its sole discretion, for Mortgage Loans in a second lien position.

A.      Seller must register any Mortgage Loan it intends to sell to Buyer prior to submission of the Mortgage Loans to Buyer for approval. Registration shall be made pursuant to the requirements set forth in the HFS Seller Guide and any Letters. Upon proper registration by Seller, the rate and price shall be locked-in by Buyer in accordance with the terms set forth in the HFS Seller Guide. By registering a Mortgage Loan, Seller obligates itself to deliver to Buyer any such Mortgage Loan closed by Seller. Delivery of the Mortgage File to the Buyer shall be made in accordance with the HFS Seller Guide and any Letters. In the event Seller is unable to deliver any Loans as provided herein due to rejection of any loan applicant or cancellation of any Loan after registration or for any reason whatsoever, Seller shall notify Buyer in writing within twenty-four (24) hours after such rejection, cancellation or other reason for failure to deliver such Loan(s).

B.      Upon completion of the Credit Package, Seller shall send the original Credit Package, plus one copy (two copies if mortgage insurance is required), to Buyer. A copy of the Letter confirming rate lock registration must be included in each Credit Package.

C.      Buyer's underwriter shall review any such Credit Package based upon Fannie Mae/Freddie Mac guidelines and/or Buyer's then current Mortgage Loan underwriting criteria applicable to the loan program under which the Mortgage Loan application was registered. Buyer reserves the right, in its sole discretion, to approve or decline the Credit Package. Buyer shall provide to Seller its credit decision in accordance with the terms of the HFS Seller Guide.

D.      Seller shall close the Mortgage Loan in its own name and shall advance the original principal balance out of its own funds.

E.      Buyer shall purchase Mortgage Loans which have been approved by Buyer, and closed and delivered by Seller in accordance with the HFS Seller Guide pursuant to the funding procedures set forth therein.

F.      Seller shall execute the Limited Power of Attorney attached hereto as Exhibit A to facilitate assignment and payment processing following purchase of Loans.

4.     **SELLER'S REPRESENTATIONS AND WARRANTIES.** Seller represents and warrants to Buyer and Buyer's successors and assigns as follows, it being acknowledged that each such representation and warranty is true and relates to material matters upon which Buyer relied, and it being understood that each such representation and warranty is made to Buyer as of the date hereof, and as to each Mortgage Loan, as of the date Seller sells the Mortgage Loan to Buyer:

3

A.    As to Seller:

1)    Organization. Seller is duly organized, validly existing and in good standing under the laws stated in the first paragraph and is qualified and authorized to transact business in, and is in good standing under the laws of, each jurisdiction in which any mortgaged property is located or is otherwise exempt under applicable law from such qualification and no demand for such qualification has been made upon Seller by any such State and in any event the Seller is or will be in compliance with the laws of any such State to the extent necessary to insure the enforceability of such Mortgage Loan and the servicing of the Mortgage Loans in accordance with the terms of this Agreement.

2)    Seller Status. Seller is a Fannie Mae/Freddie Mac approved Seller, an FHA approved mortgagee as described in 12 USC 1709 and/or a VA authorized lender as described in 38 USC 1802 or is an approved lender as determined by Buyer, and will retain said status so long as this Agreement shall remain in effect.

3)    Authority. The Seller has the requisite corporate power and authority to execute and deliver this Agreement and the Limited Power of Attorney attached as Exhibit A and to perform in accordance herewith and therewith. The execution, delivery and performance of this Agreement in accordance with the HFS Seller Guide and any Letters (including all instruments of transfer to be delivered pursuant to this Agreement) by the Seller and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action, and no other corporate proceedings on the part of Seller are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement and any Letters evidence the valid, binding and enforceable obligation of the Seller, enforceable against Seller in accordance with its terms, except as such enforcement may be affected by bankruptcy, by other insolvency laws, or by general principles of equity. No officer or agent of Buyer shall be required to make any inquiry concerning the validity of any transaction purported to be made by Seller, when made by any officer or agent of the Seller, and Buyer may conclusively assume that every obligation, contract, instrument, act or thing done and executed by any person purportedly on behalf of Seller has been so executed or done in the official capacity as the agent or officer for the Seller. Seller has the requisite corporate power and authority to own and operate its properties, to carry on its business as its now being conducted, and to consummate the transactions contemplated by this Agreement.

4

4)   No Conflict or Violation. The execution and delivery of this Agreement by Seller does not, and the performance of this Agreement by Seller will not, (i) result in a violation of or conflict with any provisions of the charter or by-laws or equivalent governing instruments of Seller, (ii) violate any law, rule, regulation, code, ordinance, judgment, injunction, order, writ, decree, or ruling applicable to Seller, or (iii) conflict with or violate any agreement, permit, concession, grant, franchise, license, or other governmental authorization or approval necessary for sale of the Loans by Seller.

5)   Title to Loans. Seller has good title to and is the sole owner and holder of record of each Loan. Seller is either the original mortgagee or holder in due course of the Loan and there has been no prior assignment, sale or hypothecation by Seller of said Loan. The loan is not assigned or pledged, and Seller has good, indefeasible and marketable title thereto, and has full right, subject to no interest or participation of, or agreement with, any other party, to sell, transfer and assign each Mortgage Loan to Buyer pursuant to this Agreement free and clear of any encumbrance, lien, claim or security interest.

6)   Litigation. No suit, action, proceeding or governmental investigation or inquiry is currently pending, or to the best knowledge of the Seller, is threatened against Seller which, if adversely determined, would have a material adverse effect on the business, assets or financial condition of Seller or would prevent the consummation of transactions contemplated by this Agreement.

7)   Accuracy of Statements. Neither this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement, the HFS Seller Guide or any Letter, or in connection with the transactions contemplated hereby, contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.

8)   Fidelity Bond. Seller has, and will maintain, at its own expense, a Fidelity Bond with broad coverage and an Errors and Omissions Policy in the amount and with the coverages required by the HFS Seller Guide and any Letters. Seller shall furnish proof of such coverage at or before selling Loans to Buyer, and thereafter at Buyer's request, no less frequently than once each year.

9)   No Personal Solicitation. For a period of three (3) years from and after any loan sale, Seller agrees that it will not take any action or permit or cause any action to be taken by any of its agents and affiliates, or by any

independent contractors or independent mortgage brokerage companies on Seller's behalf, to personally, by telephone or mail, solicit the borrower or Mortgagor under any Loan for any purpose whatsoever, including to solicit an application for a mortgage or home equity loan, or to refinance a Loan, in whole or in part, without the prior written consent of the Buyer. It is understood and agreed that all rights and benefits relating to the solicitation of any Mortgagors and the attendant rights, title and interest in and to the list of such Mortgagors and data relating to their mortgages (including insurance renewal dates) shall be transferred to the Buyer pursuant hereto and Seller shall take no action to undermine these rights and benefits. Notwithstanding the foregoing, it is understood and agreed that promotions undertaken by Seller or any Affiliate or agent of Seller which are directed to the general public at large, including, without limitation, mass mailing based on commercially acquired mailings lists, newspaper, radio and television advertisements shall not constitute solicitation under this paragraph.

B.    As to each Mortgage Loan:

1)    Documentation and Binding Obligations.    The Note and the related Mortgage are genuine, are on forms acceptable to Fannie Mae/Freddie Mac or to HFS and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms. All parties to the Note and Mortgage and any other related agreement had legal capacity to execute the Note, Mortgage or other document, and each Note, Mortgage and any other related agreement has been duly and properly executed by the Mortgagor and acknowledged, where required.

2)    Full Disbursement.    The proceeds of the Mortgage Loan have been fully disbursed to the Mortgagor or on his account. All costs, fees and expenses incurred in the making, closing and recording of the Mortgage Loan including, but not limited to, recording fees, documentary stamps, intangible taxes, hazard insurance premiums and any other taxes or assessments due and payable have been so paid. There is no requirement for future advances under the Mortgage Loan and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefor have been complied with. Seller has not and no prior holder of the Mortgage has advanced funds or induced, solicited or knowingly received any advance of funds by a party other than the Mortgagor directly or indirectly, for the payment of any amount required by the Mortgage, except for the interest accruing from the date of the Note or date of disbursement of the Mortgage proceeds, whichever is later, to the day which precedes by one month the due date of the first installment of principal and interest.

6

3)   **Legal and Contractual Compliance.**   All loans have been originated, processed, closed and serviced in compliance with all terms and conditions of this Agreement, the HFS Seller Guide and the Letters, and all applicable federal, state and local laws and governmental regulations, including without limitation, administrative rules and regulations of the, ECOA, TIL, RESPA, the Consumer Credit Protection Act, the Federal Fair Housing Act, the National Flood Insurance Act, and any usury laws.

4)   **Accurate Statements.**   The outstanding principal balance is correctly stated; all monthly payments, including sums attributable to escrow for mortgage insurance, taxes and hazard insurance, are current, and there has been no breach of the terms and conditions of the Mortgage.

5)   **Absence of Defenses.**   The Note and Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including the defense of deceptive trade practice or usury, nor will the operation of any of the terms of the Note or Mortgage, or the exercise of any right thereunder, render the Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense including the defense of usury and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto.

6)   **Hazard and Flood Insurance.**   There is in force a paid up policy of hazard insurance, and where applicable, flood insurance, insuring the improvements on the property encumbered by the Mortgage written by an insurer meeting the requirements of the HFS Seller Guide and any Letters, in an amount at least equal to the lesser of 100% of the insurable value of the improvements or the unpaid principal balance of the Mortgage, whichever is less. The insurance must be without a co-insurance clause, contains a standard mortgagee clause and loss payable endorsement in favor of Seller and its successors and assigns, and complies with all other requirements of the HFS Seller Guide and any Letters. The Mortgage obligates the Mortgagor thereunder to maintain the hazard insurance policy at such Mortgagor's cost and expense, and upon such failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Mortgagor's cost and expense.

7)   **Compliance with Zoning Laws.**   All improvements on the mortgaged property conform with all local and county zoning ordinances and other applicable laws so as to permit use and occupancy thereof as one-to-four family residence. If required by law or regulation, all environmental permits have been secured.

7

8)   <u>Location of Improvements</u>. All improvements considered in determining the appraised value of the property lie wholly within the boundaries and building restriction lines of such property and no improvements on adjoining properties encroach upon the mortgaged property, unless a title insurance policy is in effect which insures against loss from any such encroachment.

9)   <u>Valid Lien and No Mechanics Liens</u>. The Mortgage has been recorded and represents a valid, enforceable and perfected first or second lien on the real property securing the loan except for real estate taxes and special assessments not yet due and payable, covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date the Mortgage was recorded and are listed in the lender's title policy thereon. The mortgaged property is free and clear of all mechanic's and materialmen's liens or liens in the nature thereof, and no rights are outstanding that could give rise to any such lien.

10)  <u>Proper Disclosure</u>. The Mortgagor has duly executed appropriate evidence indicating that the Mortgagor has received the disclosure materials as required by applicable laws and regulations.

11)  <u>Mortgage Insurance or Guarantee</u>. Each Mortgage which Seller represents to be insured by a private mortgage insurance company, or to be insured or guaranteed by an agency of the federal government, is so insured or guaranteed, and such mortgage insurance complies with the requirements of the HFS Seller Guide and any Letters.

12)  <u>No Adverse Action</u>. Seller has not taken any action nor failed to take any action which might cause the cancellation of or otherwise adversely affect any of the required insurance policies, including hazard, flood, title and mortgage insurance, on the Loans.

13)  <u>Appraisals</u>. Seller has delivered to Buyer an appraisal of the mortgaged property signed prior to the approval of the Mortgage application by a qualified appraiser who is licensed in the state where the mortgaged property is located, who is acceptable to Buyer, who has no interest, direct or indirect, in the mortgaged property or in any loan on the security thereof and who does not receive compensation which is affected by the approval or disapproval of the Mortgage Loan. The appraisal shall be completed in compliance with the Uniform Standards of Professional Appraisal Practice, the HFS Seller Guide and any Letters, and all applicable federal and state laws and regulations.

14)  <u>Valid Assignment</u>. The transfer and assignment of the Note and Mortgage

8

from Seller to Buyer is valid and sufficient to vest title to the Note and Mortgage in Buyer.

15) <u>Title Insurance</u>.   Each Mortgage Loan is covered by either (a) an attorney's opinion of title and abstract of title, the form and substance of which are acceptable to Fannie Mae or (b) an ALTA mortgage title insurance policy or other generally acceptable form of policy or insurance acceptable to Fannie Mae/Freddie Mac or Buyer, issued by and the valid and binding obligation of a title insurer acceptable to Fannie Mae/Freddie Mac or Buyer. Such title insurer is qualified to do business in the jurisdiction where the mortgaged property is located, and the policy insures the Seller, its successors and assigns, as to the first or second priority lien of the Mortgage, as applicable, in the original principal amount of the Mortgage Loan. The Seller, its successor or assign, is the named and sole insured under such mortgage title insurance policy. The mortgage title insurance policy contains all endorsements required by Fannie Mae/Freddie Mac guidelines or the HFS Seller Guide and any Letters. Such mortgage title insurance policy is in full force and effect and will be in full force and effect and inure to the benefit of Buyer upon the consummation of the transactions contemplated by this Agreement and no claims have been made under such mortgage title insurance policy.

16) <u>No Defaults</u>.  There is no default, breach, violation or event of acceleration existing under the Mortgage, Note or related documents and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration; and the Seller has not waived any default, breach, violation or event of acceleration.   No Mortgage Loan payment is more than thirty (30) days past due.

17) <u>Customary Provisions</u>.  The Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the mortgaged property of the benefits of the security; including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure. There is no homestead or other exemption available to the Mortgagor which would interfere with the right to sell the mortgaged property at a trustee's sale or the right to foreclose the Mortgage.

18) <u>Deeds of Trust</u>.  With respect to a Mortgage constituting a deed of trust, a trustee, as authorized and duly qualified under applicable law to serve as such has been properly designated and currently so serves and is named in such deed of trust.

9

19) **Property Condition; No Condemnation.** There is no proceeding pending or threatened for the total or partial condemnation of the mortgaged property and said property is undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty so as to affect adversely the value of the mortgaged property as security for the Mortgage Loan or the use for which the premises were intended. There have been no condemnation proceedings with respect to the mortgaged property and Seller is unaware of the potential for any such proceedings in the future.

20) **No Modification.** Neither Seller nor any prior holder has modified, waived, or altered any term of the Mortgage or Note in any respect except by written instrument that was recorded, if necessary to protect the interests of the Buyer. The Mortgage has not been satisfied, canceled or subordinated, in whole or in part, or rescinded, and the mortgaged property has not been released, in whole or in part, from the lien of the Mortgage; nor has any instrument of release, cancellation, subordination, modification, rescission or satisfaction been executed. All warranties under this Section 4.B.20 shall be deemed not to have been made with respect to any specific matter brought to the attention of Buyer in writing prior to the payment of the purchase price for that Loan and specifically acknowledged by Buyer in writing.

21) **Acceptable Investment.** There are no circumstances or conditions with respect to the Mortgage, the mortgaged property, the Mortgagor or the Mortgagor's credit standing that can be reasonably expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent or adversely affect the value or marketability of the Mortgage Loan.

22) **No Ground Leases.** No mortgaged property is subject to a ground lease unless specifically authorized in writing by Buyer.

23) **Genuine Documents and Signatures.** All documents submitted by Seller pursuant to this Agreement are genuine, and legal, valid and binding obligations of the Mortgagor, enforceable in accordance with their terms. All parties to the Note and the Mortgage and any other related agreement had legal capacity to enter into the Loan and to execute and deliver the Note and Mortgage and any other related agreement. The Note and Mortgage and all related agreements have been duly and properly executed by the makers thereof. All certified copies of original documents are true copies of the originals. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be

stated therein or necessary to make the information and statements therein not misleading.    No fraud was committed in connection with the origination of the Loan.

24)    Payments.  Unless otherwise specified by Seller when registering a Loan pursuant to Section 3A. hereof or otherwise specifically agreed to by Buyer at the time of purchase, no Loan is 30 or more days delinquent (determined on a contractual basis) and no Loan has been 30 or more days delinquent (determined on a contractual basis) more than once during the 12 months. The Mortgagor has made, or shall make when due, as the case may be, the first monthly payment due after origination on or prior to its scheduled due date.

25)    No Outstanding Charges.  There are no defaults in complying with the terms of the Mortgage, and all taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing have been paid, or an escrow of funds has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable.  Seller has not advanced funds, or induced or solicited or knowingly received any advance of funds by a party other than the Mortgagor, direct or indirectly, for the payment of any amount required under the Loan, except for interest accruing from the date of the Note or date of disbursement of the Loan proceeds, whichever occurred later, to the day which precedes by one month the due date of the first monthly payment.

26)    Compliance with Applicable Laws.  Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity or disclosure laws applicable to the Loan have been complied with by Seller and, if Seller is not the originator of any such Loan, by the originator of such Loan, and the consummation of the transactions contemplated hereby will not involve the violation of any such laws or regulations.

27)    No Satisfaction of Mortgage or Note.  Neither the Mortgage nor the Note has been satisfied, cancelled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission. Seller has not waived the performance by the Mortgagor of any action, if the Mortgagor's failure to perform such action would cause the Mortgage Loan to be in default, nor has Seller waived any default resulting from any

action or inaction by the Mortgagor.

28) **Payment Terms.** For fixed-rate Loans, the Note is payable in equal monthly installments (other than the last payment) of principal and interest. For adjustable-rate Loans, the Mortgage Interest Rate is adjusted in accordance with the terms of the Note and the Note is payable each month and, during an adjustment period or initial period, in equal monthly installments of principal and interest. All required notices of interest rate and payment amount adjustments have been sent to the Mortgagor on a timely basis and the computations of such adjustments were properly calculated. Installments of interest are subject to change due to the adjustments to the Mortgage Interest Rate of each Interest Rate Adjustment, with interest calculated and payable in arrears, sufficient to amortize the Mortgage Loan fully by the stated maturity date, over an original term of not more than thirty years from commencement of amortization. All Mortgage interest rate adjustments have been made in strict compliance with state and federal law and the terms of the related Note. Any interest required to be paid pursuant to state and local law has been properly paid and credited.

29) **Occupancy of the Mortgaged Property.** Unless otherwise specified by Seller when registering a Loan pursuant to Section 3A. hereof, the mortgaged property is lawfully occupied by the Mortgagor under applicable law. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the mortgaged property and with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities.

30) **No Buydown Provisions; No Graduated Payments or Contingent Interests.** The Loan does not contain provisions pursuant to which monthly payments are paid or partially paid with funds deposited in any separate account established by Seller, the Mortgagor or anyone on behalf of the Mortgagor, or paid by any source other than the Mortgagor nor does it contain any other similar provisions currently in effect which may constitute a "buydown" provision. The Loan is not a graduated payment mortgage loan and the Loan does not have a shared appreciation or other contingent interest feature.

31) **Consolidation of Future Advances.** Any future advances made to the Mortgagor prior to the Offer Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated

12

principal amount is expressly insured as having first lien priority, if a first mortgage loan, or as having a second lien priority, if a second mortgage loan, by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to the Buyer.   The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan.

32) <u>Collection Practices; Escrow Deposits</u>.   The origination, servicing and collection practices used by Seller with respect to the Loan have been in accordance with accepted servicing practices and are in all respects in compliance with all applicable laws and regulations.   With respect to escrow deposits and escrow payments, all such payments are in possession of Seller or the servicer of such Loan and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. All escrow payments have been collected in full compliance with state and federal law.   Unless prohibited by applicable law, an escrow of funds has been established in an amount sufficient to pay for every item which remains unpaid and which has been assessed but is not yet due and payable.  No escrow deposits or escrow payments or other charges or payments due Seller have been capitalized under the Mortgage or the Note.

33) <u>Environmental Matters</u>.  To the best of the Seller's knowledge, there exists no violation of any local, state or federal environmental law, rule or regulation in respect of the Mortgaged Property which violation has or could have a material adverse effect on the market value of such Mortgaged Property.   Seller has no knowledge of any pending action or proceeding directly involving the related Mortgaged Property in which compliance with any environmental law, rule or regulation is in issue; and, to the best of Seller's knowledge, nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to the use and enjoyment of such Mortgaged Property.

34) <u>No Construction Loans</u>.  The Loan was not made in connection with (a) the construction or rehabilitation of a Mortgage Property or (b) facilitating the trade-in or exchange of a Mortgaged Property.

35) <u>Right of Rescission</u>.  With respect to refinance Loans, the Mortgagors right of rescission has not been waived.

36) <u>No Negative Amortization</u>.  No Loan is subject to, or potentially subject to, negative amortization.

37) **North Carolina High-Cost Home Loans.** The Loan is not a "high-cost home loan" as defined by Section 24.1.1 of the North Carolina General Statutes.

38) **HFS Ineligible List.** No person listed on the most recently published HFS Ineligible List was involved, directly or indirectly in originating the Loan.

5. **SURVIVAL OF COVENANTS, REPRESENTATIONS AND WARRANTIES. REPURCHASE OBLIGATION OF SELLER.** It is understood and agreed that the covenants, representations and warranties set forth in this Agreement, the HFS Seller Guide or any Letters shall survive (i) any investigation made by or on behalf of Buyer, its assignee or designee, (ii) liquidation of the Loan, (iii) termination of this Agreement, and (iv) transfer and delivery of the Mortgage File to Buyer. All such covenants, representations and warranties shall terminate ten (10) years from the date on which such covenant, representation and warranty is made. It is further understood that the covenants, representations and warranties shall inure to the benefit of the Buyer, or any holder of any endorsement of any mortgage note or any examination of the Mortgage File.

6. **COMPLIANCE WITH INSURANCE REQUIREMENTS.** Seller warrants that it will comply with and use its best efforts to cause each Mortgagor to comply with all applicable state and federal rules and regulations or requirements of the private mortgage insurance companies, including those requiring the giving of notices. Where applicable, Seller warrants that it will comply with the National Housing Act of 1934, as from time to time amended, or with the Servicemen's Readjustment Act of 1944, as amended, and with all rules and regulations issued under either Act, and with the requirements of private mortgage insurance companies, the giving of all notices and submitting of all claims required to be given or submitted to the end that the full benefit of either the Federal Housing Administration insurance, the guaranty of the United States of America, or the private mortgage insurance will inure to Buyer. Seller warrants it will forward copies of all such notices or claims to Buyer if requested by Buyer.

7a. **PURCHASE PRICE.** The purchase price will consist of the following: 1) the outstanding principal balance on the date of sale, 2) the accrued and unpaid interest, and 3) the premium as calculated in the HFS National Wholesale Correspondent Pricing Sheet, as published from time to time.

7b. **PREMIUM REBATE.** In the event that a premium is paid by the Buyer to the Seller on a Loan and such Loan is prepaid in full by the Borrower, other than by a refinancing by the Buyer or any of its subsidiaries or affiliates, within twelve (12) months of the purchase date, the Seller shall, upon demand by the Buyer, refund to the Buyer the premium paid by the Buyer to the Seller as follows: if prepayment in full is within one (1) month of the purchase date, 12/12ths of the premium shall be refunded; if prepayment in full is between one (1) and two (2) months of the purchase date, 11/12ths of the

premium shall be refunded; if prepayment in full is between two (2) and three (3) months of the purchase date, 10/12ths of the premium shall be refunded; if prepayment in full is between three (3) and four (4) months of the purchase date, 9/12ths of the premium shall be refunded; if prepayment in full is between four (4) and five (5) months of the purchase date, 8/12ths of the premium shall be refunded; if prepayment in full is between five (5) and six (6)months of the purchase date, 7/12ths of the premium shall be refunded; if prepayment in full is between six (6) and seven (7) months of the purchase date, 6/12ths of the premium shall be refunded; if prepayment in full is between seven (7) and eight (8) months of the purchase date, 5/12ths of the premium shall be refunded; if prepayment in full is between eight (8) and nine(9) months of the purchase date, 4/12ths of the premium shall be refunded; if prepayment in full is between nine (9) and ten (10) months of the purchase date, 3/12ths of the premium shall be refunded; if prepayment in full is between ten (10) and eleven (11) months of the purchase date, 2/12ths of the premium shall be refunded; if prepayment in full is between eleven (11) and twelve (12) months of the purchase date, 1/12th of the premium shall be refunded.  In the event any Loan is prepaid in full later than twelve (12) months from the purchase date of such Loan, no refund shall be due.  In the event the Note carries a prepayment penalty, the Buyer agrees to recapture the premium rebate from the proceeds of the prepayment penalty and then from Seller, if there is any deficient balance according to the refund calculation specified above.

8.   **DELIVERY OF LOAN DOCUMENTATION.**  Seller agrees to do all acts necessary to perfect title to the Mortgage Loans in Buyer, and shall sell, assign and deliver to Buyer with respect to the purchase of each such Mortgage Loan the following documents, all subject to the approval of Buyer and its legal counsel as to proper form and execution:

   A.   Mortgage Note properly endorsed by Seller and any prior holder showing a complete chain of title in accordance with Buyer's requirements.

   B.   The original Mortgage, with evidence of recording thereon, or if the original Mortgage has not been returned from the recording office, a copy of such original Mortgage certified true and correct by Seller in which case Seller shall deliver to Buyer the original recorded Mortgage within 7 days from the date received by the applicable recording office.

   C.   The original executed Assignment of Mortgage from Seller to Buyer, in recordable form and, if applicable, shall deliver to Buyer any intervening assignments of mortgage, with evidence of recording thereon within 7 days from the date received from the applicable recording office.

   D.   An original appraisal of the secured property performed and signed in accordance with the requirements of this Agreement, the HFS Seller Guide and any Letters.

   E.   An original mortgage title insurance policy if required and as defined

15

under Paragraph 4.B.15, issued by an approved ALTA title insurance company in such form and subject to such exceptions as are approved by Buyer and Buyer's counsel; provided, however, that if the original is not available as of date the Mortgage File is delivered to Buyer, Seller shall deliver the original to Buyer within 7 days from the date received from the applicable title insurance company.

F.    A survey of the property secured by the Mortgage to the extent required by applicable state law or required in order to enable Buyer to sell the Mortgage to or place the Mortgage with a private investor.

G.    A hazard insurance policy with one (1) year's paid receipt issued or written by an insurance company which has been approved by Buyer and meeting the requirements set forth in Paragraph 4.B.6 hereof, the HFS Seller Guide and the Letters, and a flood insurance policy or application if applicable.

H.    A statement showing the unpaid principal balance of the periodic installments and the date(s) to which principal, interest and any escrows have been paid; and, if required by Buyer, a ledger card or ledger history reflecting all receipts and disbursements from the inception of the Mortgage Loan including the date of each receipt or disbursement.

I.    A copy of the Settlement Statement (HUD-1) and Truth-In-Lending Disclosure statement prepared in connection with the Mortgage Loan indicating that the Mortgagor has received the disclosures required by the TIL and RESPA.

J.    Any and all documents, agreements or instruments related to the Mortgage or the Note and Seller's right and benefits therein; all documents related to the making and closing of the Loan; and any other documents, agreements, or instruments related to the Mortgage Loan or required by Buyer as specified in the HFS Seller Guide and the Letters, in order to perfect its right, title and interest in and to the Mortgage Loan or required by Buyer in order to enable Buyer to sell the Mortgage Loan to or place the Mortgage Loan with a private investor.  If all final documentation is not delivered to Buyer within the time period required by Buyer, Seller shall, at Buyer's option, repurchase the Loan or Loans upon demand in accordance with the repurchase provisions of this Agreement.  Extensions of the final documentation deadline may be granted at Buyer's option only. Buyer's acceptance of delivery of the loan documentation does not constitute approval of such documentation or a waiver of any Buyer's rights under this Agreement.

With respect the Mortgage, any intervening assignment or title insurance policy not

available to be delivered with the Mortgage File, Seller shall make its best reasonable efforts to obtain such documents on a timely basis, such efforts to include follow-up with the applicable recording office, title insurer or other Person holding such documents at least quarterly.

9.    **ELIGIBILITY OF MORTGAGE LOANS FOR SALE OR TRANSFER.** Seller agrees to take such action and to prepare, execute, assign and deliver to Buyer such documents, including but not limited to, the Mortgage, assignment of the Mortgage to Buyer, and Note properly endorsed, in such form as shall enable Buyer at Buyer's option to sell the Loan to a private investor. In addition, Seller agrees, from time to time, upon Buyer's request, to provide Buyer with additional evidence that Seller's representations and warranties contained herein are true and correct. This may include, without limitation, providing Buyer with opinions of Seller's counsel, providing Buyer with certified copies of resolutions of Seller authorizing the sale of Mortgage loans, as well as providing Buyer with reasonable access to Seller's financial records and allowing Buyer to conduct periodic on-site audits of Seller's business activities related to this Agreement. Such additional requirements shall be subject to the reasonable approval of Seller and its counsel.

10.    **REPURCHASE OF MORTGAGE LOANS.** Within five (5) business days of Seller's receipt of written demand by Buyer or Buyer's assignee, Seller shall repurchase from Buyer, at the repurchase price set forth herein, any of the following Loans:

A.    Any Loans for which Seller has failed to deliver to Buyer any document required by this Agreement, the HFS Seller Guide or any Letters within the required time frame.

B.    Any Loan with respect to which the warranties, representations or agreements of this Agreement, the HFS Seller Guide or any Letter are breached by the Seller as determined by Buyer, or wherein, in Buyer's opinion, Seller or Seller's agent has acted fraudulently or negligently in the origination or closing of a Loan.

C.    Any Loan where the first payment becomes more than thirty (30) days past due.

D.    Any Loan for which Buyer has, at its own expense, within 100 days after the purchase date, received a re-appraisal indicating a fair market value of more than twelve (12%) percent less than the original appraisal value. In that event, upon receipt by Seller of a signed copy of the reappraisal from Buyer, Seller shall repurchase the Loan at the Repurchase Price and reimburse Buyer for the cost of the appraisal subject to the following: if Seller disputes the validity of the reappraisal prepared by Buyer's appraiser, Seller may at its own expense, request Buyer to obtain a third appraisal, and only if such third appraisal is also more than twelve (12%) percent less than the original appraisal value shall the Seller be required to repurchase the Loan at the Repurchase Price and pay for the second

17

appraisal. Buyer shall choose the review appraiser with Seller's approval, which shall not be unreasonably withheld, but such appraiser must possess the minimum qualifications specified in Buyer's Underwriting Guidelines. The appraisal must be performed in accordance with the standards of the appraising industry where the property is located, by an independent appraiser unless otherwise agreed to by the parties. In determining the appropriate appraisal value, the review appraiser must determine the appraised value as of the original appraisal date using comparable sales that were available as of the date of the original appraisal.

E.    Any Loan which Buyer sold to any other investor which Buyer is required to repurchase due to a deficiency in or omission with respect to the documents, instruments and agreements pertaining to the Loan which deficiency or omission was caused by someone other than Buyer, or for any of the reasons set forth in this Section 10.

At Buyer's option, Seller may be given thirty (30) days to correct or cure any deficiencies which, in the Buyer's judgment, created a breach of this Agreement. Any delay by Buyer in providing notice to Seller or in making demand upon Seller to repurchase a Loan shall not constitute a waiver of any of Buyer's rights or remedies hereunder.

11.    **REPURCHASE PRICE.** In the event Seller repurchases a Loan from Buyer pursuant to paragraph 10 A.-D above, the price shall be that amount equal to the greater of (a) the purchase price paid to Seller by Buyer in accordance with Section 7a herein less any repayment of principal received, plus accrued but unpaid interest, or (b) the unpaid principal balance of the Loan at the date of repurchase plus accrued but unpaid interest. Upon payment of the repurchase price as set forth herein, the Loan shall be considered to have been rejected by the Buyer. At the time of repurchase, Buyer shall arrange for the re-delivery of the Mortgage File and reassignment of the Note and Mortgage to Seller.

In the event that Seller repurchases a Loan from Buyer pursuant to paragraph 10.E. above, the price to be paid by Seller to Buyer shall be an amount equal to the sum Buyer was required to pay in order to repurchase the Loan from any private investor through the date of the repurchase of the Loan from Buyer by Seller plus any costs or expenses incurred by Buyer in connection with the transaction.

12.    **INDEMNIFICATION.** In addition to Seller's repurchase obligation, Seller shall indemnify and hold Buyer and its Affiliates harmless against any, loss, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and other costs and expenses heretofore and hereafter resulting from any claim, demand, defense or assertion based or grounded upon, resulting from or arising in connection with, a breach of Seller's covenants, representations and warranties under this Agreement, the HFS Seller Guide or any Letters. The obligations of Seller under this Section shall survive the delivery and funding of the Mortgage Loans, liquidation of a Loan giving rise to the indemnification claim, and the termination of this Agreement.

13. **BOOKS AND RECORDS.** Seller agrees to keep and maintain such books and records so as to meet and comply with all applicable laws, and the requirements or recommendation of ECOA, or as specified during business hours, for examination and audit. Said records shall include a Loan register documenting all loan applications taken by Seller.

14. **FINANCIAL INFORMATION.** Seller shall furnish to Buyer for as long as this Agreement is in effect, as soon as available, and in any event within ninety (90) days after the end of each fiscal year of Seller, audited or certified financial statements of Seller consisting of a balance sheet as of the end of such fiscal year, together with related statements of income or loss and reinvested earnings and changes in financial position of Seller for such fiscal year, prepared by independent certified public accountants in accordance with generally accepted accounting principles. Seller shall also provide Buyer, from time to time, upon reasonable request and sixty (60) days' notice, any other financial reports or statements reasonably required by Buyer. However, in the event at any time Seller's net worth is less than $500,000, Seller shall furnish to Buyer unaudited financial statements within forty-five (45) days after the end of each fiscal quarter of Seller and in the event at any time Seller's net worth is less than $250,000, Seller shall furnish to Buyer unaudited financial statements within fifteen (15) days of the end of each calendar month. Seller shall promptly advise Buyer of any substantial change in Seller's ownership, financial condition, or senior management.

All such financial statements shall be delivered to:

> Household Financial Services, Inc.
> 2700 Sanders Road
> Prospect Heights, Illinois 60070
> Attention: Vice President Business Development
> Risk Management

15. **ESCROW DEPOSITS AND SERVICING RIGHTS.** At the time each Loan is sold to Buyer, Seller shall transfer, assign and convey to Buyer all of Sellers' right, title and interest in and to all escrow deposits held in connection with the Loans. Seller hereby irrevocably assigns to Buyer its right to service each Loan sold pursuant to this Agreement and to collect any servicing fee in connection with such Loan.

16. **RESTRICTIVE COVENANT.** For a period of three (3) years from the date of any Loan Sale, the Seller agrees, on behalf of itself, its subsidiaries, and affiliates, that it will not use any information obtained, directly or indirectly, from the Mortgage Files for the purpose of soliciting (or assisting any other person in soliciting) mortgage or home equity loans from the Mortgagors of the Loans.

17.    **TERMINATION AND DEFAULT.** This Agreement may be terminated with or without cause by either party upon thirty (30) days written notice to the other party, provided that the delivery requirements and other terms of this Agreement, the HFS Seller Guide and any Letters have been fully complied with; and provided further that in the event Seller fails to deliver required financial statements within the prescribed timeframes as called for in Section 14 herein, Buyer may terminate this Agreement without notice. After termination, the provisions of this Agreement, the HFS Seller Guide and any Letters shall continue to apply to any Mortgage Loans transferred from Seller to Buyer pursuant to this Agreement and any Letters.

If Seller breaches or defaults upon any term or condition of this Agreement, or does not deliver the Loans within the time periods stated in the HFS Seller Guide or any Letter or otherwise fails to comply with the Agreement, the HFS Seller Guide or any Letter, Buyer shall not be required to purchase any Loans. Seller shall be deemed to be in default if any of the following shall occur:

A.    Seller breaches or fails to comply with any term or provision of this Agreement, the HFS Seller Guide or any Letter.

B.    Any of Seller's representations or warranties in this Agreement, the HFS Seller Guide or in any Letter are untrue.

C.    Any document or paper delivered hereunder is incorrect in any material respect or otherwise does not comply with the terms and provisions of this Agreement, the HFS Seller Guide or any Letter.

D.    Any substantial reduction in Seller's net worth, as determined solely by Buyer.

E.    A petition for involuntary bankruptcy is filed against Seller, or Seller is adjudged bankrupt or insolvent by a court of competent jurisdiction or a regulatory agency, or a Court of competent jurisdiction or a regulatory agency appoints a receiver, liquidator, conservator or trustee for Seller or all or substantially all of its assets, or approves any petition filed against the Seller for its reorganization.

F.    Seller institutes proceedings for voluntary bankruptcy, files a petition seeking reorganization under the Federal Bankruptcy Act, files under any law for the relief of debtors, consents to the appointment of a receiver of all or substantially all of its property, makes a general assignment for the benefit of its creditors, or admits in writing its inability to pay its debts generally as they become due.

G.    Seller, without Buyer's consent, merges with or consolidates into another

20

corporation, sells or otherwise disposes of all or substantially all of its property and assets, or permits any change to occur in the stock ownership of the company which would transfer effective voting control from the persons now exercising such control to others.

H.    The placement of Seller on probation or restriction of its activities in any manner by a Federal or state government agency, including Freddie Mac, Fannie Mae, or GNMA.

18.    **NOTICES.** All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed duly given if delivered or mailed via certified or registered mail, return receipt, requested, postage prepaid or by any generally recognized over night delivery service such as, Express Mail, Federal Express or Airborne, addressed as follows:

    to Buyer:         Household Financial Services, Inc.
                       2700 Sanders Road
                       Prospect Heights, IL 60070
                       Attn: Loren J. Morris, Vice President Business Development Risk Management

    with a copy to:    Household Financial Services, Inc.
                       2700 Sanders Road
                       Prospect Heights, IL 60070
                       Attn: General Counsel

    to Seller:         *American Freedom Mortgage, Inc*
                       *1000 Circle 75, Suite 1180*
                       *Atlanta, GA 30339*
                       Attention: *Tamara L. Burch*

or to such other address as Buyer and Seller shalt, have specified in writing to each other.

19.    **NO WAIVER.** Failure or delay on the part of Buyer to audit any Loan or to exercise any right provided for herein, shall not act as a waiver thereof, nor shall any single or partial exercise of any right by Buyer preclude any other or further exercise thereof. In no event shall a term or provision of this Agreement be deemed to have been waived, modified or amended, unless said waiver, modification or amendment is in writing and signed by the parties hereto. Notwithstanding any investigation conducted before or after the purchase of any Loan, and notwithstanding any actual or implied knowledge or notice of any facts or circumstances which Buyer may have as a result of such investigation or otherwise, Buyer shall be entitled to rely upon the warranties, representations and covenants of Seller in this Agreement, the HFS Seller Guide or in any Letter, and the obligations of

Seller with respect thereto shall survive the purchase of said Loans by Buyer and inure to the benefit of all future assignees of said Loans.

20. **NO REMEDY EXCLUSIVE.** No remedy under this Agreement is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Agreement or existing at law or in equity.

21. **INDEPENDENT CONTRACTOR.** Nothing herein contained shall be deemed or construed to create a partnership or joint venture between Seller and Buyer. In the performance of its duties or obligations under this Agreement, Seller shall be deemed to be, or conduct itself to insure that its status shall be that of an independent contractor operating as a separate entity. None of Seller's employees, agents or servants are entitled to the benefits that are provided to the employees of the Buyer. Buyer is solely interested in the results obtained under this contract and therefore the manner and means of conducting Seller's business affairs are under the sole control of Seller and Seller shall be solely and entirely responsible for its acts and for the acts of its agents, employees and servants.

22. **BUYERS ACCEPTANCE.** This Agreement shall not be binding on Buyer until Buyer's acceptance of same at its offices in Prospect Heights, Illinois. Acceptance of the Agreement by Buyer shall be deemed to have occurred in Prospect Heights, Illinois when the Agreement is signed by an authorized representative of Buyer and mailed or delivered to the Seller.

23. **ENTIRE AGREEMENT.** Seller acknowledges that no representations, agreements or promises were made to Seller by Buyer or any of its employees other than those representations, agreements or promises specifically contained herein, in the HFS Seller Guide or in any Letters. This Agreement, the HFS Seller Guide and any Letter constitutes the entire Agreement and understanding of the parties with respect to the matters and transactions contemplated hereby. This Agreement supersedes any prior Agreement and understanding with respect to these matters and transactions.

24. **ASSIGNMENT.** Neither party shall have the right to assign any of its duties, obligations or rights under this Agreement without the prior written consent of the other; provided, however, that Buyer may assign its interests in this Agreement and/or in any Letter to any affiliate.

25. **MODIFICATION.** This Agreement may not be modified except by a writing signed by both parties.

26. **GOVERNING LAW.** This Agreement shall be governed by and be considered in accordance with the laws of the State of Illinois.

27. **COUNTERPARTS.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

28. **CHOICE OF FORUM.** Any judicial proceeding brought against any of the parties hereto with respect to this Agreement shall be brought in any court of competent jurisdiction in Cook County, Illinois or in the Federal District Court for the Northern District of the State of Illinois irrespective of where such party may be located at the time of such proceeding, and by execution and delivery of this Agreement, each of the parties to this Agreement hereby consents to the exclusive jurisdiction of any such court and waives any defense or opposition to such jurisdiction.

29. **WAIVER OF JURY TRIAL. EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

IN WITNESS WHEREOF, Buyer and Seller have caused their respective duly authorized representatives to execute this Agreement as of the date first written above.

(BUYER)    HOUSEHOLD FINANCIAL SERVICES, INC.

By: _____
Name:    Loren J. Morris
Title:    Vice President

(SELLER)  AMERICAN FREEDOM MORTGAGE, INC.

By: _____
Name: Tamara L. Burch
Title: President

Hfslaw/flowagmt/masterflow4
eff 2/14/02

EXHIBIT A

# EXHIBIT C

**VIA TELECOPY**
**(770) 955-8991**


December 28, 2005


Ms. Ann Myers
American Freedom Mortgage, Inc.
2211 New Market Parkway
Suite 130
Marietta, GA  30067

Re:    **Keyonna Cotton, 198 Franklin Road, Pontiac, MI  48341**
       **Loan #11265204**

Dear Ms Myers:

In conformance with Section 4.3(c) of the Bulk Continuing Loan Purchase Agreement between Household Financial Services, Inc. and American Freedom Mortgage dated as of March 29, 2002, please find below the repurchase price for the captioned loan.  The borrower has failed to make the first payment with respect to the loan on its due date.

Please wire the sum of $102,661.73 on Friday, January 13, 2006.

|  |  |
|---|---|
| Unpaid Principal Balance | $99,000.00 |
| Interest to 01/13/06 | 3,661.73 |
| Premium | 0.00 |
| Total | $102,661.73 |
| Per Diem | $27.39 |

Wire Instructions:

| | |
|---|---|
| Bank | HSBC Bank |
| | Buffalo, New York |
| ABA# | 021001088 |
| Account # | 001842447 |
| Account Name | Mortgage Services -- Seller Repurchases |
| Ref: | Cotton #11265204/Repurchase |

If you have any questions, please call me at (847) 564-6897.

Very truly yours,


Thomas S. Winslow

| cc: | Nancy Case | Martha Newsom | Dank Pinckney |
|---|---|---|---|
| | Michelle Guy | Ari Ohlson | Shobe Rosado |
| | Bill Moulton | Chris Olliff | Bonnie Salins |
| | | | Jim Mitchell |

# EXHIBIT D

**VIA TELECOPY**
(770) 955-8991

September 22, 2005

Ms. Ann Myers
American Freedom Mortgage, Inc.
2211 New Market Parkway
Suite 130
Marietta, GA 30067

Re:    **Eve Harris, 7468 Midnight Cove, Memphis, TN 38125**
       **Loan #10354959**

Dear Ms Myers:

In conformance with Section 4.3(c) of the Bulk Continuing Loan Purchase Agreement between Household Financial Services, Inc. and American Freedom Mortgage dated as of March 29, 2002, please find below the repurchase price for the captioned loan. The borrower has failed to make the first payment with respect to the loan on its due date.

Please wire the sum of $153,006.05 on Friday, October 15, 2005.

|  |  |
|---|---|
| Unpaid Principal Balance | $143,900.00 |
| Interest to 10/15/05 | 6,547.80 |
| Premium | 2,558.25 |
| Total | $153,006.05 |
| Per Diem | $39.42 |

Wire Instructions:

| | |
|---|---|
| Bank | HSBC Bank |
| | Buffalo, New York |
| ABA# | 021001088 |
| Account # | 001842447 |
| Account Name | Mortgage Services – Seller Repurchases |
| Ref: | Harris #10354959/Repurchase |

If you have any questions, please call me at (847) 564-6897.

Very truly yours,

Thomas S. Winslow

cc:   Pam Chester        Ari Ohlson        Jim Mitchell
      Michelle Guy       Shobe Rosado
      Martha Newsom      Bonnie Salins

# EXHIBIT E

July 12, 2005


Ms. Tamara Burch
American Freedom Mortgage, Inc.
2211 New Market Parkway
Suite 130
Marietta, GA 30067-9310

Re:    Flow Loan Purchase Agreement by and between HSBC Mortgage Services Inc. f/k/a
       Household Mortgage Services and its affiliates, and American Freedom Mortgage, Inc.
       dated as of March 29, 2002 (the "Agreement")

Dear Ms. Burch:

Pursuant to Section 7b (Premium Rebate) of the Agreement described above, Buyer hereby
requests a refund of premium in the amount of **$6,412.50.** This amount represents the premium
rebate due for loans that were paid-off through June 2005, as well as any unpaid previously billed
amount (detail attached).

Within the next 15 days, please remit payment to HSBC Mortgage Services; you may send a
check or wire funds as outlined below:

| | |
|---|---|
| Wire Instructions | |
| Bank Name: | HSBC Bank |
| Address: | One HSBC Center, Buffalo, NY 14203 |
| Account Name: | MS Service Clearing |
| Account Number: | 001842790 |
| ABA #: | 021001088 |
| Attention: | Terry Rudenko |
| Reference: | Premium Rebate |
| | |
| Send Check To: | HSBC Mortgage Services |
| | Attn: Terry Rudenko |
| | 2700 Sanders Road – 1S |
| | Prospect Heights, IL 60070 |

Should you have any questions regarding this matter, please do not hesitate to contact me at
(847) 291-2173.

Very truly yours,


Terry Rudenko
Business Relations


Enclosure

11:03 Friday, July 1, 2005   25

HSBC MORTGAGE SERVICES
REPORT RUN DATE: 01JUL05
EARLY LOAN PAYOFF - PREMIUM RECAPTURE

------- SELLER-NAME=AMERICAN FREEDOM MORTGAGE, INC. LIEN=1 BULKFLOW=FLOW -------

| LOAN NO | CUSTOMER NAME | OLD LOAN NO | FUNDING DATE | XFER BALANCE | DAYS TO PIF | PIF DATE | PREMIUM PAID | RECAPTURE PERCENT | PREMIUM LOST | PREPAY COLLECTED | RECAPTURE AMT DUE | SALE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0010375699 | GAINES, D | 2005101462 | 05/18/05 | 152000 | 27 | 06/14/05 | 6080.00 | 100% | 6080.00 | 0.00 | 6080.00 | 8372594853 |

N = 1

------- SELLER-NAME=AMERICAN FREEDOM MORTGAGE, INC. LIEN=2 BULKFLOW=FLOW -------

| LOAN NO | CUSTOMER NAME | OLD LOAN NO | FUNDING DATE | XFER BALANCE | DAYS TO PIF | PIF DATE | PREMIUM PAID | RECAPTURE PERCENT | PREMIUM LOST | PREPAY COLLECTED | RECAPTURE AMT DUE | SALE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0010380491 | GAINES, D | 2005101460 | 05/19/05 | 0 | 26 | 06/14/05 | 332.50 | 100% | 332.50 | 0.00 | 332.50 | 8372594853 |
| SELLER_NAME | | | | | | | 6412.50 | | 6412.50 | 0.00 | 6412.50 | |

N = 1

EQEU.IA000000.EQWO.JCL.ALLPROD(MGPOPREM)

# HSBC ◀✕▶

## PAST DUE NOTICE

September 19, 2005

Ms. Tamara Burch
American Freedom Mortgage, Inc.
2211 New Market Parkway
Suite 130
Marietta, GA 30067-9310

Re:     Flow Loan Purchase Agreement by and between HSBC Mortgage Services Inc. f/k/a Household Mortgage Services and its affiliates, and American Freedom Mortgage, Inc. dated as of March 29, 2002 (the "Agreement")

Dear Ms. Burch:

Pursuant to Section 7b (Premium Rebate) of the Agreement described above, Buyer hereby requests a refund of premium in the amount of **$8,914.30 of which $2,501.80 is current and $6,412.50 past due.** This amount represents the premium rebate due for loans that were paid-off through August 2005, as well as any unpaid previously billed amount (detail attached).

Within the next 15 days, please remit payment to HSBC Mortgage Services; you may send a check or wire funds as outlined below:

|  |  |
|---|---|
| <u>Wire Instructions</u> | |
| Bank Name: | HSBC Bank |
| Address: | One HSBC Center, Buffalo, NY 14203 |
| Account Name: | MS Service Clearing |
| Account Number: | 001842790 |
| ABA #: | 021001088 |
| Attention: | Terry Rudenko |
| Reference: | Premium Rebate |
| | |
| <u>Send Check To:</u> | HSBC Mortgage Services |
| | Attn: Terry Rudenko |
| | 2700 Sanders Road – 1S |
| | Prospect Heights, IL 60070 |

Should you have any questions regarding this matter, please do not hesitate to contact me at (847) 291-2173.

Very truly yours,


Terry Rudenko
Business Relations


Enclosure

13:03 Thursday, September 1, 2005   26

HSBC MORTGAGE SERVICES
REPORT RUN DATE: 01SEP05
EARLY LOAN PAYOFF - PREMIUM RECAPTURE

------- SELLER-NAME=AMERICAN FREEDOM MORTGAGE, INC. LIEN=1 BULKFLOW=FLOW -------

| LOAN NO | CUSTOMER NAME | OLD LOAN NO | FUNDING DATE | XFER BALANCE | DAYS TO PIF | PIF DATE | PREMIUM PAID | RECAPTURE PERCENT | PREMIUM LOST | PREPAY COLLECTED | RECAPTURE AMT DUE | SALE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0009652639 | MERRELL, S | 2004338069 | 01/10/05 | 137600 | 233 | 08/31/05 | 6004.31 | 41.7% | 2501.80 | 0.00 | 2501.80 | 8372542589 |

N = 1

EQEU.IA000000.EQWO.JCL.ALLPROD(MGPOPREN)

**PAST DUE NOTICE**

October 11, 2005

Ms. Tamara Burch
American Freedom Mortgage, Inc.
2211 New Market Parkway
Suite 130
Marietta, GA 30067-9310

Re:     Flow Loan Purchase Agreement by and between HSBC Mortgage Services Inc. f/k/a
        Household Mortgage Services and its affiliates, and American Freedom Mortgage, Inc.
        dated as of March 29, 2002 (the "Agreement")

Dear Ms. Burch:

Pursuant to Section 7b (Premium Rebate) of the Agreement described above, Buyer hereby
requests a refund of premium in the amount of **$11,035.64 of which $2,121.34 is current and
$8,914.30 is past due.** This amount represents the premium rebate due for loans that were paid-
off through September 2005, as well as any unpaid previously billed amount (detail attached).

Within the next 15 days, please remit payment to HSBC Mortgage Services; you may send a
check or wire funds as outlined below:

|                      |                                      |
|----------------------|--------------------------------------|
| **Wire Instructions**|                                      |
| Bank Name:           | HSBC Bank                            |
| Address:             | One HSBC Center, Buffalo, NY 14203   |
| Account Name:        | MS Service Clearing                  |
| Account Number:      | 001842790                            |
| ABA #:               | 021001088                            |
| Attention:           | Terry Rudenko                        |
| Reference:           | Premium Rebate                       |

|                    |                             |
|--------------------|-----------------------------|
| **Send Check To:** | HSBC Mortgage Services      |
|                    | Attn:  Terry Rudenko        |
|                    | 2700 Sanders Road – 1S      |
|                    | Prospect Heights, IL 60070  |

Should you have any questions regarding this matter, please do not hesitate to contact me at
(847) 291-2173.

Very truly yours,

Terry Rudenko
Business Relations

Enclosure

09:01 Saturday, October 1, 2005    24

HSBC MORTGAGE SERVICES
REPORT RUN DATE: 01OCT05
EARLY LOAN PAYOFF - PREMIUM RECAPTURE

-------- SELLER-NAME=AMERICAN FREEDOM MORTGAGE, INC. LIEN=1 BULKFLOW=FLOW --------

| LOAN NO | CUSTOMER NAME | OLD LOAN NO | FUNDING DATE | XFER BALANCE | DAYS TO PIF | PIF DATE | PREMIUM PAID | RECAPTURE PERCENT | PREMIUM LOST | PREPAY COLLECTED | RECAPTURE AMT DUE | SALE ID |
|---------|---------------|-------------|--------------|--------------|-------------|----------|--------------|-------------------|--------------|------------------|-------------------|---------|
| 0009259516 | ASHLEY, J | 2004289651 | 11/10/04 | 177600 | 295 | 09/01/05 | 8485.37 | 25.0% | 2121.34 | 0.00 | 2121.34 | 8372539898 |

N = 1

EQEU.IA000000.EQWO.JCL.ALLPRODC(MGPOPREM)